**BRIDGEPORT GUARDIANS, INC. et al.**

v.

**MEMBERS OF the BRIDGEPORT CIVIL SERVICE COMMISSION et al.**

Civ. No. B-457.

United States District Court,
D. Connecticut.

Jan. 29, 1973.

---

Michael Koskoff, Ira Horowitz, Mark Gross, Bridgeport, Conn., for plaintiffs.

J. Daniel Sagarin, James F. Stapleton, and Jack Samowitz, James J. O'Connell, and Nancy O'Connell, Howard T. Owens, Jr., Bridgeport, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This is a Civil Rights Act suit challenging the constitutionality of the hiring and promotion procedures of the Bridgeport, Connecticut, Police Department. 42 U.S.C. §§ 1981, 1983. Plaintiffs include several Black members of the Bridgeport police force, some of whom have taken but failed promotion examinations, Black and Puerto Rican residents of Bridgeport who have taken but failed the patrolman's examination, Bridgeport Guardians, Inc., a non-profit corporation whose membership includes nearly all the Black policemen of Bridgeport, and Housing Police Benevolent Assn., a non-profit corporation whose members are special policemen patrolling the public housing projects of Bridgeport. The defendants are the members and the director of the Bridgeport Civil Service Commission and the superintendent of police. Intervening defendants are Bridgeport police officers who are or may be eligible for promotion, and applicants for the rank of patrolman who stand high on current eligibility lists and would be appointed but for this lawsuit.

Plaintiffs seek to bring this action as a class action pursuant to Fed. R.Civ.P. 23. The class they seek to represent is set out in the margin.[1] The

---

1. (a) All present and future minority group patrolmen and officers in the Bridgeport Police Department who will seek promotion within that Department.

(b) All minority group members who will be taking future Civil Service examinations for appointment to the Bridgeport Police Department and will be exposed to discrimination if the present examination and appointment system is left unchanged; or have passed the examination but were placed in a lower position on the eligibility list than they otherwise would have been had the appointment procedures not been discriminatory in nature.

(c) All minority group members who would be eligible for appointment to positions within the Bridgeport Police Department but who are either unaware of the availability of such appointments or are unwilling to apply for such appointments because they believe the appointment procedures are discriminatory and unlawful in nature or because the Defendants have failed to establish a credible recruitment policy amongst minority group members. Complaint ¶ 12.

pleadings do not provide definition to the phrase "minority group members." Though the evidence deals with discrimination against Blacks and Puerto Ricans, there is some question of whether the class has been adequately defined. Cf. Chaffee v. Johnson, 229 F.Supp. 445 (S.D.Miss.1964). In any event, since any equitable relief to which plaintiffs may be entitled would benefit all persons similarly situated, there is no compelling reason to designate a class. Bailey v. Patterson, 323 F.2d 201, 207 (5th Cir. 1963).

■ Defendants have objected to the inclusion as plaintiffs of the association of Black policemen and the association of housing policemen. Since the individual plaintiffs' standing is uncontested, the standing of the groups is not critical to the maintenance of the suit. See NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972). Moreover, in this and other contexts, a group has been accorded standing to assert the rights of its members who have been injured in fact. NAACP v. Allen, *supra*; Sierra Club v. Mason, 351 F.Supp. 419 (D.Conn.1972). Members of both groups have taken and failed the patrolman's exam which is alleged in this suit to be discriminatory.

■ Defendants have also sought to have the suit dismissed on the ground that the grievance asserted by plaintiffs falls within the jurisdiction of the Equal Employment Opportunity Commission, in view of the 1972 amendment to Title VII of the Civil Rights Act of 1964, which removed the exemption of states and political subdivisions from the definition of employers subject to the Act. P.L. 92–261 (1972); 42 U.S.C.A. § 2000e(b). Even if the availability of an administrative forum invoked the doctrine of primary jurisdiction in this context, which most courts have rejected,[2] the doctrine would be inapplicable here where the suit was filed prior to the effective date of the amendment enlarging the jurisdiction of the E.E.O.C.

On the merits, the initial inquiry in suits of this sort is whether the plaintiffs have established a *prima facie* case of *de facto* discrimination with respect to Bridgeport's procedures for hiring and promoting policemen sufficient to shift to the city the burden of justifying the use of these procedures despite their discriminatory effect. Chance v. Board of Examiners, 458 F.2d 1167 (2nd Cir. 1972); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (*en banc*); Shield Club v. Cleveland, (N.D.Ohio Dec. 21, 1972); Western Addition Community Organization v. Alioto, 330 F.Supp. 536 (N.D. Cal.1971); see Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971), applying this approach in Title VII litigation.

I

The hiring procedure for Bridgeport policemen has four elements. First, an applicant fills out an application form. The information he supplies concerning age, height, weight, etc. is used to determine his eligibility for appointment. Second, an eligible applicant takes a written multiple-choice examination. The passing grade is 75 on a scale from 0 to 100. This grade is established as a part of the city charter in the rules of the civil service commission and applies to all civil service tests throughout the city's employment. Third, the applicant's prior training and experience is rated according to a chart which assigns arithmetical values for various kinds

2. Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (3rd Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971);

Young v. International Telephone and Telegraph Co., Nesbitt Division, 438 F.2d 757 (3rd Cir.); Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972).

and lengths of experience and for college education. Fourth, a background investigation is conducted by the police department for all applicants who pass the written exam. The results of the background investigation are reviewed by the director of the civil service commission who decides in his discretion whether the applicant surmounts this hurdle. For those applicants who meet eligibility requirements and pass the written exam and the background investigation, a cumulative numerical rating is determined by giving the exam grade a weight of 70% and the training and experience rating a weight of 30%. The civil service commission prepares an eligibility list for the position of patrolman, ranking all successful applicants in accordance with their cumulative, weighted numerical rating. Pursuant to the city regulations, the eligibility list is valid for two years.[3] Whenever vacancies are to be filled in the rank of patrolman, appointments are made from the eligibility list strictly in order of standing on the list.

Plaintiffs' principal claim of discrimination in the hiring procedure is aimed at the written exam. Their evidence disclosed that 644 persons had taken the exam on the six occasions when it was given between 1965 and 1970. The passing rate for the 568 White applicants was 58%. The passing rate for the 76 Black and Puerto Rican [4] applicants was 17%. The passing rate for Whites was thus $3\frac{1}{2}$ times the rate for Blacks and Puerto Ricans. In *Chance*, a *prima facie* showing of discriminatory tests was based in part on passing rates for Whites $1\frac{1}{2}$ and 2 times that of Blacks and Puerto Ricans. 458 F.2d at 1170; 330 F.Supp. 203 at 210–122.

To highlight the significance of the disparity in passing rates, plaintiffs' statistical expert analyzed the results of the last three exams, each of which was taken by more than 100 applicants. He calculated that with respect to the differences in passing rates on the November, 1967, and the 1970 exams, the probability of these occurring by chance was less than 1 in 10,000, and that the comparable probability figure for the 1968 exam was less than 1 in 100.

Plaintiffs contend additional significance is given to the disparity in passing rates by the resulting low numbers of Blacks and Puerto Ricans in the Bridgeport Police Department on an absolute basis and compared to the city population. Of the 469 members of the department, 17 (3.6%) are Black or Puerto Rican, and this is the most there has ever been.[4a] Of these, 16 are patrolmen, one is a detective, and none is in a supervisory rank. The 1970 census figures disclose that Bridgeport's population was 16% Black and 9% Spanish-speaking, for a combined Black and Puerto Rico percentage of 25%.

---

3. Civil Service Provisions of the Bridgeport City Charter, § 9.

By order dated Oct. 19, 1972, this court tolled the two-year period of validity of existing eligibility lists as of Mar. 6, 1972, to maintain the status quo and ensure flexibility in the fashioning of an appropriate remedy. Mar. 6, 1972 was the date the parties agreed to a consent order prohibiting the filling of vacancies pending a decision on the merits of this case.

4. To ascertain the number of Puerto Rican applicants, plaintiffs identified every Spanish-surnamed applicant. From information supplied on the application form or, in some instances, from personal interview, plaintiffs sought to ascertain which of these applicants were either born in Puerto Rico or were of Puerto Rican origin. Spanish-surnamed applicants whose birth place or origin could not be established as Puerto Rican were not counted as Puerto Ricans. While this identification process may, in a few rare instances, have omitted some Puerto Ricans or erroneously included some non-Puerto Ricans, such minor discrepancies would not significantly affect the gross disparity between passing rates.

4a. The first Black patrolman was hired in 1950.

Finally, plaintiffs compared the Bridgeport figures with comparable figures from Connecticut's two other large cities, Hartford and New Haven:

| | Bridgeport | Hartford | New Haven |
|---|---|---|---|
| Total population | 156,542 | 158,017 | 137,707 |
| Blacks | 25,476 (16%) | 44,540 (28%) | 36,175 (26%) |
| Spanish speaking | 14,103 (9%) | 11,942 (8%) | 4,916 (4%) |
| Combined Black and Spanish speaking | 39,579 (25%) | 56,482 (36%) | 41,091 (30%) |
| Total police department | 469 | 483 | 434 |
| Black and Puerto Rican policemen | 17 (3.6%) | 66 (14%) | 57 (13%) |
| Personnel in police department above the rank of patrolman | 117 | 139 | 126 |
| Blacks and Puerto Ricans in police ranks above patrolman | 1 (1%) | 22 (16%) | 13 (10%) |

Defendants dispute on a number of grounds the contention that these figures establish a *prima facie* case that the patrolman's exam is discriminatory. First, defendants sought to establish that the differences in passing rates are not due to any racial or ethnic bias in the tests, but instead are a reflection of the quality of schooling the applicants received. Defendants analyzed the passing rates and average scores of all Blacks, Spanish surnames and foreign-born Whites who took the patrolman's exam since 1965. The Blacks were divided into those born in Bridgeport and those born outside of Connecticut; the Spanish surnames were divided into those born in mainland United States and those born in Puerto Rico. The figures disclose that the 15 Blacks born in Bridgeport averaged 66.276% on the test with 6 (40%) passing; the 36 Blacks born outside of Connecticut averaged 55.624% on the test with 5 (13.9%) passing, and while the number educated in Connecticut who failed is not known, 4 of those who passed were educated in Connecticut. The 5 Spanish-surnamed candidates born in the mainland United States averaged 70.22% on the test with 3 (60%) passing; the 24 Spanish-surnamed candidates born in Puerto Rico averaged 52.992% on the test with 4 (17%) passing. The number of Spanish surnames born in Puerto Rico but educated in Connecticut who failed is not known, but of those who passed, 2 were educated in Bridgeport. The 12 foreign-born Whites averaged 66.176% on the test with 2 (17%) passing, and no data offered indicated where they were educated.

The premise of defendants' argument seems to be that as to Blacks, a Connecticut education is superior to an out-of-state education, and as to Spanish-surnamed applicants, a mainland education is superior to a Puerto Rican education. Not only is the premise unsupported, but there is no basis for knowing where the Blacks born outside of Connecticut, the Spanish surnamed born in Puerto Rico, and the foreign born actually received their education.

More fundamentally, this data fails to remove the *prima facie* showing of discrimination because it does not alter but only tries to explain the difference in passing rates. Even if defendants' evidence could establish that this difference is due in large part to the quality of schooling, a *prima facie* showing of discrimination would nonetheless remain if a test is used that significantly separates the applicants by any factor, including poor quality of schooling, and race or ethnic origin correlate highly with this factor. See Castro v. Beecher, *supra*; cf. Beal v. Lindsay, 468

F.2d 287 (2nd Cir. 1972). Of course this does not mean that a test cannot be used whenever those with poor schooling score less well than those with good schooling. But if members of a minority group score significantly less well than others, then even if this result stems from the poor schooling many of them received, the burden shifts to the employer to provide some adequate justification for use of the test. It may well be that good schooling provides attributes needed for job performance; if so, it should not be difficult to demonstrate the validity of the test. The point is that a discriminatory test result cannot be rebutted by showing that other factors led to the racial or ethnic classification. The classification itself is sufficient to require some adequate justification for the test.

 Second, defendants contend that the plaintiffs' statistical showing is inadequate to shift the burden of justifying the tests in the absence of any evidence of intentional discrimination or even opportunity to discriminate through the exercise of subjective judgment. As defendants point out, the hiring procedures are designed to reduce to a minimum all opportunity for subjective evaluation of the applicants. Only the results of the background investigation are subject to an administrator's discretion. The applicants for the written exam are assigned a number to insure that no discrimination can permeate the test scoring.

It may well be that not every showing of a statistical disparity between groups will establish a *prima facie* discrimination, but the case law indicates that facts such as are established here are sufficient even in the absence of deliberate discrimination or opportunity for subjective discrimination. Chance v. Board of Examiners, *supra;* Castro v. Beecher, *supra*. The difference between passing rates for Whites as compared to Blacks and Puerto Ricans is startling. So is the comparison between the Black and Puerto Rican percentage of the po-

lice force, 3.6%, and their percentage of the Bridgeport population, 25%. So is the comparison between the ratios of Black and Puerto Rican police percentages to population percentages in comparable Connecticut cities: Bridgeport, 3.-6% to 25%, Hartford, 14% to 36%, New Haven, 13% to 30%. While the disparity in Hartford and New Haven leaves much to be desired, the disparity in Bridgeport raises the most serious questions about the neutrality of an exam that produces such a result. Interestingly, Hartford and New Haven give their patrolman applicants a different exam than the one used in Bridgeport.

 Finally, defendants mount minor attacks on the statistics themselves. They point out that the results of the 1966 exam disclose that the passing rate for Blacks and Puerto Ricans, 50%, was actually higher than the passing rate for Whites, 38%. However, since only 4 Blacks and Puerto Ricans took the 1966 exam, the passing rate is based on too small a sample to have statistical significance. Moreover, in *Chance,* the minority group had a better passing rate on some of the exams, but a lower rate in the aggregate of all exams. 330 F.Supp. at 211. Defendants also contend that the aggregate figures show, by their count, that Whites took the exam a total of 543 times and passed 314 times, while Blacks and Puerto Ricans took the exam a total of 103 times and passed 20 times. Even if these figures were accepted, the resulting passing rates would be 58% for Whites and 19% for Blacks and Puerto Ricans, an insignificant variation from the percentages based on plaintiffs' figures. Defendants also contend that the low number of Blacks and Puerto Ricans on the Bridgeport police force is explained more by the low number of applicants than by the discriminatory effect of the patrolman's exam. For the five years analyzed by the parties, there were 568 White applicants who were found eligible to take the patrolman's exam and only 76 Blacks and Puerto Ricans. Nevertheless

Blacks and Puerto Ricans were 11% of the eligible applicants, but constitute only 3.6% of the police force. A significant disparity remains. Moreover, as plaintiffs point out, the low number of Black and Puerto Rican applicants to the police department may well be a reflection of the lack of opportunity they observe there, an understandable conclusion in light of the fact that no Black or Puerto Rican now holds or ever has held a permanent supervisory rank within the department.

The evidence establishes a "disparity of sufficient magnitude" between hiring of Whites and of Blacks and Puerto Ricans to place upon the defendants the burden of providing adequate justification for the use of the patrolman's exam. Chance v. Board of Examiners, supra, 458 F.2d at 1176. The nature of the justification required has not been settled by the case law. There is uncertainty both as to the applicable standard under the equal protection clause and the applicable standard from the field of psychological testing. As to the constitutional standard, the Second Circuit has left unresolved the question of whether an unintentional, discriminatory effect is to be scrutinized under the compelling state interest test or the rational relationship test. Id. at 1177. In Chance the Court of Appeals analyzed the District Court's approach as applying a "heavy burden of proof" to the question of whether the examination was "job-related." Ibid. The compelling interest test was found not to have been invoked, primarily because the District Court did not require demonstration that no less discriminatory means of selection was available.

With deference, it seems to me that this disclaimer of the compelling interest test does not leave the rational relationship test as the only alternative, nor does it seem that such a minimal standard was in fact applied in Chance. Cases applying the rational relationship test to alleged violations of the equal protection clause have not insisted that anything be established by a "heavy burden of proof." See, e. g., McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L. Ed.2d 393 (1961). Moreover, the District Court's formulation of the standard it applied, "a strong showing . . . that the examinations are required to measure abilities essential to performance of the . . . positions for which they are given," was followed immediately by the citation of Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), perhaps the modern high-water mark of the compelling state interest test in the equal protection field. 330 F.Supp. at 216.

What Chance required to be proved—namely, job-relatedness, is rarely if ever a standard that examinations will not meet under the traditional rational relationship test. The Court of Appeals purported to find the examinations lacking in rational relationship because the District Court had found them not to be job-related, and thus, as the Second Circuit said, "wholly irrelevant to the achievement of a valid state objective." 458 F.2d at 1177. But the District Court, as I read its decision, did not say that use of the exam was irrational in the sense that no person could rationally believe that the exam was of any value in selecting personnel. Rather the District Court found the exam to have insufficient content validity to justify its continued use, given the discriminatory effect it was shown to have. As will be discussed shortly, content validity and other standards from the field of psychological testing may often be found to be inadequately met, but rarely can one say the standard is so inadequately met that use of the exam could not rationally be thought useful for personnel selection.

The compelling interest test has been applied in equal protection cases when some state classification was based on a suspect criterion such as race or was alleged to impair the exercise of a fundamental constitutional right. See Shapiro v. Thompson, supra, 394 U.S. at 658–660, 89 S.Ct. 1322 (Harlan, J. dissenting). At first blush, cases like the

pending one seem to invoke the first branch of the compelling interest doctrine because of the claim that racial or ethnic origin is the basis of the discrimination. But further analysis reveals that race is not the classifying factor, at least not in the same way it was in cases that identified the factor as "suspect," *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), and required a "very heavy burden of justification," *Loving v. Virginia,* 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In those cases the classification was based on race. Here the classification is based on a certain result, passage of an exam (or, more precisely, achieving a sufficiently high passing grade to secure appointment), and this result correlates disproportionately with race. The exam is therefore said to have a discriminatory effect. This same approach has been taken in cases challenging provision of municipal services, *Hawkins v. Town of Shaw, Mississippi,* 437 F.2d 1286 (5th Cir. 1971), and administration of governmental programs, *Norwalk Core v. Norwalk Redevelopment Agency,* 395 F.2d 920 (2nd Cir. 1968).[5]

■ The compelling interest test, at least in its full rigor, has not been used, probably out of a concern that this test, which is rarely met, would invalidate all sorts of governmental actions which do not impose classifications based on race, even though they can be shown to have in varying degrees a racially discriminatory effect. However, a proper regard for the fundamental purpose of the equal protection clause requires that state action having a racially discriminatory effect must overcome more than a test of mere rationality.

■ It is easier to place the standard somewhere between compelling interest and rational relationship than to articulate a definitive formulation.[6] Ultimately, a court must conscientiously assess all the relevant factors, especially the degree of discriminatory effect and the degree to which the exam has utility in personnel selection, and make a judgment whether the use of the exam is justified notwithstanding its discriminatory effect. I believe that is what the District Court actually did in *Chance,* and it is what I propose to do here.

■ Determining the utility of an exam, however, requires some consideration of the standards applied in the field of psychological testing. Three approaches are used. (a) The preferred approach is criterion-related or predictive validity. Criteria are identified which reflect successful performance of the job, and test scores are then correlated with the performance ratings for the pre-determined criteria. A high cor-

---

5. Employment cases are not strictly analogous to other cases assessing the discriminatory effect of governmental action in at least the following respect. The municipal services and governmental program cases examine the pool of people denied the benefit and measure whether a significant percentage of this pool are members of a racial or ethnic minority. The precise parallel here would be to examine the pool of people who failed the written exam (or, more technically, did not achieve a grade high enough to secure appointment) and then measure whether the percentage of this pool who are Blacks and Puerto Ricans is significant, *i. e.,* considerably higher than their percentage in the community. Employment cases, however, have eschewed such analysis in favor of a comparison of passing rates of the various racial and ethnic groups who applied to take the exam. This has been done presumably on the theory that where few Blacks or Puerto Ricans are employed, members of these groups are discouraged from applying for employment, a factor that artificially diminishes the absolute number of persons from these groups who fail the employment requirements. Comparisons of passing rates of various groups avoids this discount, and thus focuses more directly on the impact of the exam itself.

6. For example, in the Title VII context, the Court in *Griggs* held an employer whose test had a discriminatory effect to a showing of "manifest relationship to the employment in question." *Griggs, supra,* 401 U.S. at 432, 91 S.Ct. at 854. *Cf. Castro v. Beecher, supra,* 459 F.2d at 732 ("substantially related to job performance").

relation demonstrates that the test is a useful predictor of the quality of the applicant's job performance. (b) Construct validity involves an identification of what the psychologists call "constructs," and what laymen would probably call characteristics or traits, that are believed to be important to successful job performance. A test is then given which purports to measure the degree to which the applicant possesses the required characteristics. (c) Content validity involves the direct measurement of knowledge or skill needed for successful job performance.

Unlike the examinations to which they are applied, these "tests" are not readily susceptible to passing or failing grades. All of them have shortcomings. Criterion-related validation requires measurement of the employee's job performance. If the task is typing, speed and accuracy can be readily and accurately measured. But with jobs of more complexity, especially those requiring exercise of judgment, there is not likely to be agreement on which criteria are truly indicative of successful job performance, nor has the art of evaluation acquired such precision that measurements of job performance can always be readily or accurately made. Who is to say what aspects of a policeman's work is to be measured—crimes solved, crimes prevented, or people assisted, and what measurements are to be used for job performance characteristics such as compassion, dedication and discretion? Construct validation similarly invites dispute as to which

characteristics are the significant ones to be tested for, to what degree the applicant should possess these characteristics and what measurements are valid. Content validation also poses problems concerning which fields of knowledge should be tested for and how much knowledge of a field should be required; moreover, this approach injects the uncertainty as to whether a person found to have an appropriate amount of knowledge of appropriate fields will actually perform on the basis of that knowledge when confronted with the realities of his work assignment.

■ The Court of Appeals in *Chance* explicitly left open the question whether exams that have a racially discriminatory effect can be justified only upon a demonstration of criterion-related validity, since the evidence there was found insufficient to establish adequate content validity. 458 F.2d at 1177, n. 16. However, the Second Circuit did rely upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, for the proposition that the employer bears the burden of proof to justify discriminatory exams. 458 F.2d at 1176. This at least raises the question of whether in non-Title VII suits such as this, a court should insist that exams be shown to have criterion-related validity unless such validation is not feasible, a standard imposed by the E.E.O.C. 29 C.F.R. § 1607.5(a).[7]

In the instant case, there is no evidence of criterion-related validity.

---

7. § 1607.5 Minimum standards for validation.

(a) For the purpose of satisfying the requirements of this part, empirical evidence in support of a test's validity must be based on studies employing generally accepted procedures for determining criterion-related validity, such as those described in "Standards for Educational and Psychological Tests and Manuals" published by American Psychological Association, 1200 17th Street N. W., Washington, D.C. 20036. Evidence of content or construct validity, as defined in that publication, may also be appropriate where criterion-related validity is not feasible.

However, evidence for content or construct validity should be accompanied by sufficient information from job analyses to demonstrate the relevance of the content (in the case of job knowledge or proficiency tests) or the construct (in the case of trait measures). Evidence of content validity alone may be acceptable for well-developed tests that consist of suitable samples of the essential knowledge, skills or behaviors composing the job in question. The types of knowledge, skills or behaviors contemplated here do not include those which can be acquired in a brief orientation to the job.

Since suits of this sort have only recently been brought, it is not surprising that defendants did not anticipate such litigation by planning criterion-related studies before giving the exams. However, the absence of concurrent validation studies is not without significance. By this technique an employer endeavors to correlate the job performance of current employees with their prior exam scores. Since these scores still exist at least for a substantial number of present patrolmen and the suit has been pending for nearly a year, it would have been possible for the defendants to rate those patrolmen for whom test scores are still available and determine how much of a correlation exists between test score and job performance. Moreover, the police superintendent candidly testified that he does not think the exams tell much about performance of police duties and he does not even look at them in making acting appointments. Even if an affirmative showing of criterion-related validity is not required, the evidence here strongly suggests that the patrolman's exam *lacks* criterion-related validity.

Defendants seek to justify the patrolman's exam on a combination of construct and content validity. Assessing this contention requires some consideration of the test itself.

The patrolman's exam used by the Bridgeport Police Department is any one of a four-exam series prepared by the Public Personnel Association (PPA). PPA is a private, nonprofit association of groups and individuals in the public employment field. More than 1,000 governmental jurisdictions are members. The patrolman's exams were created by staff members of PPA in 1953. The tests are currently used by several hundred jurisdictions, with between 15,000 and 20,000 copies sold annually. The four exams, three of which are all variations of the first exam, are essentially aptitude tests with a superficial appearance of adaptation for police work in a small portion of the questions. Each exam consists of 120 multiple choice questions. According to Jeremiah Donovan, associate director of PPA, the tests cover six areas: reading comprehension, vocabulary, arithmetic, exercise of judgment, general information and capacity to observe and remember faces and basic biographical data. From my own inspection of the exams, I find no questions that can reasonably be said to assess judgment. Perhaps defendants' counsel are closer to the mark when they characterize one of the areas tested as "reasoning" ability.

Defendants urge that vocabulary, arithmetic and general information are bodies of knowledge needed for police work, and that the capacity to comprehend written material, to reason, and to observe and remember faces and data are characteristics needed for police work. Hence they conclude that the tests have a combination of content and construct validity.

Plaintiffs attack this conclusion on several counts. Their expert, Richard Barrett, a nationally known industrial psychologist with special expertise in testing, found the tests inadequate for proper selection of potential policemen. He objected to the tests' emphasis on reading and verbal skills, which, he testified, has been found to produce a cultural bias in similar standardized intelligence tests. Moreover, he criticized the absence of any systematic attempt to analyze the specifications of the job being tested for and to construct a test that measured appropriate areas and degrees of knowledge, skills or constructs that are necessary for satisfactory job performance. For example, he noted that the abilities of applicants to handle repetitive, routine assignments or to react calmly under stress were not tested. Barrett also stated that while he did not doubt that the test was of some help in measuring intelligence, he found the test of no value whatever in measuring dedication or compassion. Superintendent Walsh had identified these as the three prime qualities for a policeman.

Barrett also criticized the section of the test measuring ability to observe

and remember faces and data. This section consists of 8 sets of front and profile mug shots, accompanied by brief data with respect to each person pictured. After viewing the pictures and data for 5 minutes, the applicants must answer 20 multiple-choice questions that require matching the faces with the names and with the data. All the faces are of Whites. Barrett expressed the view that it is probably easier for Whites to distinguish among White faces and for Blacks to distinguish among Black faces than for either group to distinguish among faces of the other group.

Some of the questions were criticized for seeking information that could readily be taught in a training program, such as questions asking the physical change usually recorded on a lie detector, or the correct procedure for dealing with an epileptic; others were criticized as being trivial such as questions asking which element is associated with the atomic bomb, or which territory the United States purchased from Spain. (Pl.Ex. 15, exam 10–a, questions 79, 80, 91, 92). Other questions are subject to criticism on the ground that the allegedly correct answer contains an inaccuracy that might well cause a conscientious applicant to refrain from marking it. For example, question 49 of test 10–a offers the statement, "A substantial proportion (more than 40%) of persons arrested and fingerprinted have been previously arrested and fingerprinted." The applicant is asked to choose a sentence that this statement "most nearly means." The "correct" choice is, "Persons who break the law once may well do so again." One's confidence in police selection is not enhanced by knowing that one applicant will be preferred over another by expressing the view that a person arrested is the equivalent of a person who has broken the law.

Finally, it should be noted that the PPA's own associate director did not claim the test was job related. His contention was that the patrolman's test assesses a person's ability to do well in recruit training, but not necessarily his ability to do the job of policing. However, defendants did not even establish that high test scores correlate well with success in the training program, much less that successful trainees do well on the job. See Pennsylvania v. O'Neill, 348 F.Supp. 1084, at 1090–1091 (D.C. Pa.).

To assess these conflicting contentions requires return to the matter of the appropriate standard. If the test is really the traditional one of rationality, I cannot say that it is irrational for the Bridgeport Civil Service Commission to believe the patrolman's test is of some utility in selecting applicants for the rank of patrolman. Even if it fails to test for all the content or constructs needed for the job, it does test for some indicia of intelligence, and it is not irrational for a municipal employer to want to make sure the patrolmen selected are the ones who rank high with respect to these indicia of intelligence.[8] Moreover, the civil service commission could rationally conclude that some other constructs not tested for, such as compassion and dedication, are not readily susceptible to quantitative measurement. But something more must be shown than mere rationality for this reason: if the patrolman's exam could be used, despite its discriminatory effect, solely because it can rationally be said to measure some indicia of intelligence, then job relatedness as a standard would cease to have meaning. The cultural bias inherent in so many tests that emphasize reading skills would invariably be permitted to accomplish a discriminatory result, because intelligence could always be said to be necessary for performance of most jobs, and such a test could always be said to be of some use in measuring intelligence. This approach would not show

---

8. Of course, the rather nebulous element of the "test-wise" attribute of some applicants, as testified to by Dr. Barrett, could not be ignored even in such a finding of rationality.

that a discriminatory employment exam meets the standard of job relatedness; it would dispense with the standard entirely.

■ The evidence does not persuade me that the patrolman's test is sufficiently job related to justify its use in the circumstances of this case. There is inadequate evidence to support a conclusion that, despite its discriminatory effect, these patrolman's tests are sufficiently useful in distinguishing, at a passing grade of 75, between those who are qualified to be policemen and those who are not, much less in providing a mathematical rating that counts 70% in determining the precise order of appointment for all passing applicants.[8a] It may well be that defendants need not demonstrate that the tests comply with all the desirable standards for predictive validation recommended by the American Psychological Association, even though these standards are used as a benchmark by the E.E.O.C. 29 C.F.R. § 1607.5(a). It may be that predictive validity need not be shown at all, though there is some evidence that such validation is feasible, which might well make it a requirement by E.E.O.C. standards. But even if content or construct validity is used as the measure of job relatedness —a standard which all the experts agreed was less reliable than predictive validity—the evidence does not demonstrate that this lesser standard has been met.

■ There is no evidence that the job of a Bridgeport patrolman has ever been analyzed to determine what knowledge an applicant should be required to possess or what constructs should be identified in a prospective patrolman. The current job descriptions are rudimentary at best and most likely inadequate for such analysis had it been attempted. There has been no showing that the exam measures with proper relative emphasis all or even most of the essential areas of knowledge and the traits needed for proper job performance. Even if the exam need not be comprehensive as to content or constructs, the evidence does not indicate whether the few areas of knowledge and the few traits measured are the ones that will identify suitable candidates for the job of patrolman. This is not to doubt that arithmetic and reading comprehension are important for policemen. But without evidence, it cannot be determined whether this exam, in identifying those with skill in these areas, might not screen out others, somewhat but not seriously deficient in these areas, who would excel as policemen because of their talents in areas not tested for at all. An exam of this sort, which does not attempt to be comprehensive in testing for content or constructs, employs a sampling approach. Such an exam might, in some circumstances, be shown to meet the standard of job relatedness. But the evidence does not establish the representativeness of the knowledge or traits sampled by the exam used here.

In the presence of satisfactory evidence of content or construct validity even based on sampling, the shortcomings pointed out by Barrett and apparent from the court's own scrutiny might not render the exam unacceptable. But without such evidence, these shortcomings cannot be ignored. Moreover, no independent expert, skilled in the art of personnel selection and testing, has offered any opinion as to the positive worth of the exam as a valid selector for

8a. Defendants properly point out that the 75% passing grade has not *per se* denied the plaintiffs employment, since the scores of those who passed but were not hired did not produce a cumulative weighted score high enough to be reached on the eligibility lists. Nevertheless the 75% passing grade screened out some plaintiffs who might have had a sufficient amount of the knowledge and traits tested to perform well as patrolmen and who might have scored better than some of those hired if their score in the areas tested was properly combined with measures of other knowledge and traits needed for job performance.

the rank of patrolman.[9] The burden of proof is upon the defendants, not simply to show that the employer could rationally believe the exam is job related, but to demonstrate by persuasive evidence that the exam is in fact job related. The evidence simply does not support a conclusion that this burden has been met in the circumstances of this case.

Therefore the patrolman's exam may not be used in the manner in which it has been used by the defendants. To what extent this exam or, preferably, an improved version of it could be used to play some part in the hiring process for Bridgeport patrolmen can best be determined upon whatever evidence the defendants offer in the future to justify the job relatedness of the exam procedure they wish to use for hiring, pursuant to the remedy provisions set forth in part III, *infra*. For the measurement of arithmetic and reading skills is not unconstitutional; but this exam has an unconstitutional effect because as used, it classified applicants by race and national origin without sufficient evidence of job relatedness to justify such a result.

Defendants rely heavily on Judge Gesell's decision in Davis v. Washington, 348 F.Supp. 15 (D.D.C.1972), which found use of a standard aptitude test sufficiently job related for use in police hiring despite an unspecified difference in passing rates between Whites and Blacks. The approach of that decision is consistent with the analysis here. *Davis* did not insist that the exam be justified by a compelling state interest test, nor did it approve the exam simply on a minimal finding of rational basis to believe it is useful. The exam was considered in the context in which it was used, and it was found acceptable in light of all the circumstances of the case. These included some correlation between high test scores and high job performance, the use of a 40% passing grade, the admission of all applicants with this passing grade to the police training academy, concerted efforts by the police department to assist those in the academy to complete the required training program, extensive recruiting efforts among minority groups, and the fact that 44% of recently hired policemen were Blacks. In those circumstances the exam was found to have sufficient utility in selecting policemen. The circumstances of this case are entirely different.

█ Apart from the written examination, plaintiffs make no challenge to the eligibility requirements, the training and experience rating system, or the defendants' right to disqualify some applicants on the basis of a background investigation. Plaintiffs do, however, contend that the administration of the background investigation procedure is defective in that standards for assessing emotional stability, good moral character, and the significance of an arrest record are either non-existent or so general as to permit the discriminatory use of discretion. Without in any way approving the current system of assessing the results of the background investigation, I find that the record does not establish a sufficient *prima facie* case of discrimination to justify further inquiry

---

9. Defendants' first expert, Vincent M. Murphy, associate dean of arts and sciences at Fairfield University, did not give any opinion about the exams challenged in this suit. His testimony, not significantly at odds with Barrett's, concerned general principles of testing. Interestingly, Murphy expressed the view that while a content valid test may be appropriate in some circumstances, criterion-related validation is necessary to check the worth of a test, once it is shown that different groups achieve significantly different results on the test. Defendants' second expert, Henry J. Mulhearn, is a retired New York City police officer, who has in recent years conducted classes to prepare policemen to take promotion exams. His testimony concerned only the promotion exams. Donovan, from the PPA, is of course not in a position to give an independent assessment of the patrolman's exam; moreover, his view, as previously indicated, emphasized the worth of the exam as a measure of suitability for recruit training, not job performance.

as to the validity of the system. There is no evidence that any of the plaintiffs were rejected because of the background investigation. Cf. Gregory v. Litton Systems, Inc., 316 F.Supp. 401 (C.D. Cal.1970). Moreover, plaintiffs made no claim that the background investigation operates to disqualify a disproportionate number of Blacks or Puerto Ricans.[10] Their essential argument is that opportunities for subjective judgment that might discriminate must be eliminated once the statistics show a significantly low percentage of non-Whites hired.

■■■ But in this case, the reason for the low percentage of non-Whites is plainly the written exam. Once that has been identified, a court should be cautious in reviewing other aspects of the hiring procedure which have not been shown to have had a discriminatory effect. This case is unlike United States v. Sheet Metal Workers Int'l Assn., Local 36, 416 F.2d 123, 136 (8th Cir. 1969), where opportunity to discriminate was barred because of the defendant's past history of deliberately choosing to exclude Negroes. If the defendants persist in giving the director of the civil service commission unguided discretion to reject applicants because of arrest records, it will be time enough in subsequent litigation to review this practice on a record that more pointedly illustrates that such a practice is discriminatory as to a class or arbitrary as to an individual. Meanwhile it is not too much to expect that the Commission, alerted to the problem, will act affirmatively without judicial intervention, especially in light of Superintendent Walsh's forthright testimony that arrest records should not in his judgment be disqualifying.

## II

The promotion procedure for Bridgeport policemen has five elements. First, candidates for promotion must become eligible by remaining in their current grade for three years. Second, eligible candidates take a written multiple-choice examination. The passing grade is 75 on a scale of 0 to 100. Third, each candidate is given a service record rating based on a system known as the Probst Service Report. This consists of a listing of 102 positive and negative characteristics stated in somewhat simplistic terms, e. g., "usually pleasant and cheerful," "talks too much," "cool-headed," "too easy-going." Three supervisory officers are asked to check each of the characteristics on the Probst form applicable to a candidate. Scoring is determined by the number of positive characteristics checked minus the number of negative characteristics checked, with each weighted according to a formula. The highest attainable score is 95, and most candidates, estimated by the Commission's executive director at 85%, in fact score 95. Fourth, each candidate is given a numerical rating for training, experience and general qualification (TEGQ). This rating is based entirely on length of service in the department over three years for candidates for the rank of detective and sergeant. For higher ranks, the TEGQ grade is determined by officers from other departments who conduct an oral interview of the candidate. Fifth, candidates are given seniority ratings, based simply on total length of service in the department. A candidate's total score is determined by weighing the various grades as follows: written test, 40%; Probst rating, 20%; TEGQ, 30%; seniority, 10%. Candidates who scored at least 75 on the written test are ranked on an eligibility list in accordance with their weighted total score. Promotions are made strictly in accordance with rank on the eligibility list.

10. Defendants claim that a chart (Pl.Ex. 42) listing all disapproved applicants with the reasons for disapproval shows that a larger percentage of Whites are disqualified for non-exam reasons than non-Whites. Since so few Blacks and Puerto Ricans pass the exam, and since background investigations are made only of those who pass, the significance of this claim is somewhat diminished.

As with the hiring procedures, plaintiffs' principal claim of discrimination in the promotion procedures is aimed at the written exam, specifically the exam taken by candidates for the rank of sergeant. Unlike the patrolman's exam, however, the sergeant's exam was taken by so few non-White candidates that the determination of a *prima facie* case of discrimination cannot be made by a simple comparison of group passing rates. Since 1960 only 20 non-Whites have taken the sergeant's exam. Plaintiffs' statistical expert testified that for exams given prior to 1972, the number of non-White candidates was too small even to attempt statistical analysis. For the 1972 sergeant's exam, there were 201 candidates, of whom 10 were Black or Puerto Rican. The passing rate for the 191 White candidates was 68%. The passing rate for the 10 non-Whites was 40%. The average score for all candidates was 77.76; for the non-White candidates, 72.59. Plaintiffs' statistical expert testified that the probability of this passing rate difference occurring by chance was about 8 in 100.

■ While this probability may have some statistical significance, the numbers on which it is based are too small to have constitutional significance. If only one more non-White candidate had passed the exam, the comparative passing rates would be 68% and 50%, too slight a difference to establish a *prima facie* case of discrimination. Even if the 68% to 40% comparison is sufficient under *Chance*, these figures cannot be relied upon when a different result achieved by a single candidate could so drastically alter the comparative figures.

■ Nevertheless, plaintiffs contend that their evidence is sufficient to shift to the defendants the burden of establishing the job-relatedness of the exam.

First, they argue that the absence of any Blacks or Puerto Ricans in the supervisory ranks of the Bridgeport police department—now or ever—establishes *prima facie* discrimination. While such a pattern can shift the burden with respect to hiring procedures, which form the threshold barrier to employment, Carter v. Gallagher, *supra*, it does not follow that the absence of non-White supervisory personnel can shift the burden as to this sergeant's promotion exam. For here the absence of non-White supervisory personnel cannot be assumed to·be the result of discriminatory promotion procedures; on the contrary, the evidence shows that the absence results from the discriminatory hiring exam, a barrier overcome by only the small number of non-Whites who ever became eligible to take the sergeant's exam. It does not seem reasonable to view the absence of non-White supervisory personnel as *prima facie* evidence of discriminatory promotion exams when the record here so clearly pinpoints the hiring exams as the actual cause of the result here challenged.

■ Second, plaintiffs argue from the very fact that so few non-Whites ever become eligible to take the sergeant's exam that greater significance should be attached to whatever disparity in passing rates is observed in the results of this exam. The argument relies on *Chance* where both the District Court, 330 F.Supp. at 210–211, and the Court of Appeals, 458 F.2d at 1176, observed that the passing rate disparity for the assistant principal's exam had a magnifying effect on the results of the principal's exam.[11] But this superficial similarity should not be pressed too far. A discriminatory employment device at an entry level of employment cannot automatically call into question the validity of every test

---

11. As the figures in Judge Mansfield's example illustrate, 330 F.Supp. at 211, the passing rate on the first exam does not alter the passing rates of the groups who· take the second exam; in his example, these rates are assumed to be identical for both exams. But the disparity in passing rates on the first exam magnifies the *significance* of an equal passing rate disparity on the second exam and results in a greater passing rate disparity between the groups who take *both* exams.

or practice used at all higher levels, even though advancement can occur only through the ranks. Otherwise courts would be called upon to review the validity of tests and practices which in no realistic sense present a justiciable controversy. In *Chance* the results of the principal's exam were included in the figures showing a disparity in passing rates for groups taking both the principal's and assistant principal's exam. While the disparity was greater on the latter exam, there apparently was also a meaningful disparity on the former. Moreover, the numbers of those who took the principal's exam were large enough to give significance to whatever disparity resulted, unlike the sergeant's exam here, taken by only 10 non-Whites in 1972. Finally, the written portion of the principal's exam had, until changed prior to the litigation, included the same type of multiple-choice questions found lacking in justification on the assistant principal's exam, and the oral interview was deemed to raise a "substantial question" of discrimination by White examiners. 330 F.Supp. at 203. Here there is no opportunity for subjective evaluation of candidates for sergeant, and the content of the sergeant's exam, while vulnerable to substantial challenge as to job-relatedness,[12] purports to test for knowledge of policing, unlike the patrolman's exam, which is at best a rudimentary aptitude test. Furthermore, there is no evidence presented or cited that the sergeant's exam, which is used elsewhere, produces a significant passing rate disparity between racial groups when taken by large numbers of candidates. Cf. Griggs v. Duke Power Co., *supra*, 401 U.S. at 430, n. 6, 91 S.Ct. 849.

■ This record is simply insufficient to warrant judicial determination of the validity of the promotion examinations for the Bridgeport Police Department. Nor is there sufficient evidence of discrimination to call for decision as to the other elements of the promotion procedure. The absence of Blacks and Puerto Ricans in the supervisory ranks is the direct result of their having been screened out by the discriminatory impact of the patrolman's exam. A remedy for the discrimination in hiring may well have to encompass supervisory ranks to "eliminate the discriminatory effects of the past," Louisiana v. United States, 380 U.S. 145, 154, 85 S. Ct. 817, 822, 13 L.Ed.2d 709 (1964), but judicial determination of the validity of the promotion procedures must await a time when lack or paucity of Blacks and Puerto Ricans in supervisory ranks, if such should continue, can fairly be viewed as the result of discriminatory promotion procedures. Of course, the defendants, now alerted to their responsibilities in these matters, may elect to take the initiative and to review all elements of the promotion procedure to determine whether they make sense from the standpoint of sound personnel administration and whether they can be shown to have predictive validity. Deficiency on either count might well prompt the responsible administrators to adopt new practices. Even if the promotion practices are not adjudicated in this lawsuit, the citizens of Bridgeport are entitled to have the supervisory personnel of their police department selected on a basis that gives some assurance that they will perform well on the job.

## III

■ There remains the formulation of an equitable remedy for the discrimination that has occurred through the use for many years of discriminatory patrol-

---

12. For example, the evidence disclosed that an enterprising firm regularly publishes a "study guide" which contains most if not all of the questions actually used on the 1972 sergeant's exam together with the correct answers. Defendants discount the significance of this publication by pointing out that the book contains many more questions than those used on the 1972 exam. Nevertheless, the existence of this publication, admittedly used in prior years by some of the successful Bridgeport police officers, raises a substantial question whether the promotion exam tests for ability to perform as a supervisory officer or simply to memorize correct answers.

man's exams that have not been shown to be sufficiently job related to justify their use. Competing factors bear on this task. Police officers testified with understandable fervor as to their opposition to any change in a personnel system that has been designed to eliminate opportunities for subjective judgment in hiring and promotion, at least to the rank of sergeant. They are proud that these employment decisions cannot be based on preference for any group, whether identified by politics, nationality, religion, or race. They take comfort in a system where decisions are made strictly by the numbers. Whether human judgment, despite its susceptibility to error and bias, should be totally removed from such a sensitive task as selecting men qualified for the significant task of modern urban policing is a public policy issue inappropriate for judicial decision. However, a court, obligated to remedy past discrimination, cannot be deterred by whatever real or imagined virtues inhere in a system that has brought about discriminatory results.

The claim of the plaintiffs is compelling. Having been discriminated against, they are entitled to have the effects of that discrimination ended. Because this case arises in the context of police employment, there is present a broader public equity. The citizens of Bridgeport have a right to the enforcement of law by a police department staffed on a non-discriminatory basis.

Some practical concerns must be considered. No remedy should require the hiring or promotion of any person not qualified for the position. Accordingly with respect to each of the positions covered by this court's decree, hiring or promotion of Blacks and Puerto Ricans is required only from a pool of candidates qualified for the position. It will be up to the defendants in the first instance to develop their own standards of qualification. The defendants will submit to the court for review and approval their plan for the identification of qualified Black and Puerto Rican candidates. Only if the court is satisfied that the defendants cannot locate Black and Puerto Rican candidates meeting court-approved qualifications will defendants be permitted to depart from the hiring and promotion requirements herein specified. Plaintiffs urge that there now exists in the special housing police force a corps of qualified Black and Puerto Rican policemen who should be designated by the court as a source for Black and Puerto Rican patrolman appointments. It may well be that the defendants will choose to make experience such a significant part of a patrolman's qualification that these special housing police will readily qualify. But that decision should be made initially by the defendants.

The decree will include ranks above patrolman in order to remedy the effects of past discrimination. The defendants have insisted throughout the litigation that the promotion procedures do not discriminate against Blacks or Puerto Ricans. Without adjudicating that proposition, the court is entitled to accept it for purposes of framing a remedy. If it is correct, then Blacks and Puerto Ricans who would have come into the department at the patrolman's rank but for the discriminatory patrolman's exam would have risen through the ranks. Therefore it is appropriate to remedy the past discrimination by insuring in the near future adequate Black and Puerto Rican representation in ranks above patrolman.

Promotion of Blacks and Puerto Ricans to the ranks of lieutenant and captain can be somewhat delayed for two reasons. First, significant numbers of Blacks and Puerto Ricans have sought to become patrolmen only since 1965. Had a non-discriminatory patrolman's exam been used, it is not certain that qualified Blacks and Puerto Ricans would have moved into the ranks of lieutenant and captain by now (assuming non-discriminatory promotion), but it is realistic to believe they would be in a position to move into these ranks in the very near future were it not for the discriminatory entrance barrier. Second, a slight delay in the use of a pool of qualified Blacks and Puerto Ricans for pro-

motion to these ranks will enable those who now become sergeants to gain the experience necessary to warrant consideration for later promotion.

 Obviously time-in-grade requirements stand in the way of a meaningful remedy. If a Black or Puerto Rican is to pierce the all-White ranks of captain, present rules would postpone that result for a minimum of nine years while he works his way up with three years each in the ranks of patrolman, sergeant and lieutenant. On the other hand, the defendants may reasonably conclude that a new patrolman is simply not qualified to be advanced rapidly to senior officer ranks. One available answer is to disregard time-in-grade and perhaps other restrictions and to look beyond the borders of Bridgeport to find qualified officer candidates. For example, the department will not be heard to say they cannot find a qualified Black or Puerto Rican candidate to be a captain until they have looked at lieutenants in other cities such as New York. Local restrictions must of course give way to orders necessary to make effective this court's decree. See Carter v. Gallagher, *supra*, 452 F.2d at 328.

 Much of the controversy in this area has concerned the difference between quota hiring to remedy past discrimination and some arguably less rigid approach involving affirmative action toward a goal. Ultimately the distinction becomes illusory. As the time nears to reach the goal, a member of the discriminated group must be hired in preference to a majority group person as often as is required to meet the goal. A quota, for all its unhappy connotations, is simply a recognition of the reality encountered in reaching the desired goal. See United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46, 471 F.2d 408 (2nd Cir. 1973).

In this case is seems appropriate to aim toward a goal of approximately 15%

Black and Puerto Rican representation in the various ranks of the department. The present authorized strength at the various ranks is: patrolman, 347; detective, 44; sergeant, 39; lieutenant, 19; and captain, 12. In addition to present vacancies in these ranks, there is also the prospect of early city action to create 20 additional positions in the rank of patrolman.

Plaintiffs are entitled to declaratory and injunctive relief. The judgment will declare that the patrolman's examination as used by the defendants now has and for many years has had the effect of denying plaintiffs their constitutional right to the equal protection of the laws. The judgment will remedy this violation of rights by an injunction with the following provisions:

1. Defendants and their employees are enjoined from using patrolman's examinations of the type found discriminatory in this suit in the manner such examinations have been used. Until the remaining provisions of this decree have been complied with, any written examination for the rank of patrolman which the defendants propose to use together with the use to be made of its results shall, prior to use, be submitted to the court for review and approval together with satisfactory evidence that the proposed examination is job related and not discriminatory in the manner in which it will be used.

2. In making appointments to the rank of patrolman and promotions to the ranks of detective, sergeant, lieutenant, and captain, defendants shall assemble a pool of Black and Puerto Rican candidates qualified for the position (hereinafter referred to as "minority pool") and shall make appointments and promotions from such pool to the number of current and future vacancies specified in the following provisions:

(a)(1). Half of the current ten vacancies in the rank of patrolman.[13]

---

13. By agreement of the parties, one of the ten current vacancies in the rank of patrolman was filled during the course of this litigation on the understanding that

it would be counted as a non-minority position for purposes of any court-ordered remedy.

(2). Three-fourths of the next 20 vacancies in the rank of patrolman whether caused by the creation of new positions or otherwise.[14]

(3). Half of all vacancies in the rank of patrolman occurring thereafter until the number of Black and Puerto Rican patrolman is 50.[15]

(b). Half of all current and future vacancies in the rank of detective until the number of Black and Puerto Rican detectives is 6.

(c). Half of all current and future vacancies in the rank of sergeant until the number of Black and Puerto Rican sergeants is 6.

(d). Half of all vacancies occurring after January 1, 1974 in the rank of lieutenant until the number of Black and Puerto Rican lieutenants is 3.

(e). Half of all vacancies occurring after January 1, 1975 in the rank of captain until the number of Black and Puerto Rican captains is 2.

(f). In filling current and future vacancies pursuant to the provisions of 2(a)(3)–(e), the initial vacancy and every odd-numbered vacancy thereafter shall be filled from the minority pool. In filling future vacancies pursuant to the provisions of 2(a)(2), if the 20 vacancies specified therein are not created

simultaneously, the first 15 vacancies shall be filled from the minority pool.

(g). Variation from the formulas set forth in 2(a)–(e) will be permitted only upon court order obtained upon a showing of (a) unavailability of qualified Black and Puerto Rican candidates, or (b) other good cause.

(h). Blacks and Puerto Ricans appointed to the rank of patrolman or promoted to higher ranks under normal personnel procedures shall not be considered as appointments or promotions from the minority pool for purposes of the provisions of 2(a)–(e) but shall be counted for purposes of meeting the target totals for Blacks and Puerto Ricans set forth in these provisions.

3. Criteria and procedures to be used in determining qualifications for the minority pool and plans for recruiting qualified candidates for the minority pool shall be submitted to the court for review and approval before being used. Exemption from state and local restrictions will be approved where necessary to effectuate this decree.

4. This court's order of October 19, 1972, tolling as of March 6, 1972, the period of validity of existing eligibility lists for the rank of patrolman and detective, is modified to provide that such lists are valid for use in filling positions

14. It is appropriate to require a somewhat higher rate of use of the minority pool for filling these 20 vacancies because the past discrimination must be remedied without undue passage of time and the prospect of the creation of 20 new positions permits substantial progress to be made. Moreover, once current patrolman vacancies are filled pursuant to 2(a)(1), no valid eligibility list for patrolman will exist, see provision 4 of this decree, *infra*. Thereafter, use of the minority pool will not disadvantage any of the candidates for patrolman who currently stand high on a valid eligibility list. *Cf.* Carter v. Gallagher, *supra*.

15. The combined effect of provisions 2(a) (1)–(3) will be that the minority pool

will be used to hire 34 patrolmen (5 of the current 10 vacancies, 15 of the next 20, and 14 of the next 28) to increase Black and Puerto Rican patrolmen from the present number of 16 to the target of 50, while regular personnel procedures will be used to hire 24 patrolmen (5 of the current 10 vacancies, 5 of the next 20, and 14 of the next 28). In reaching the target of 50, the minority pool will therefore be used for 58.6% of the next 58 appointments, although this percentage will increase a point or two to the extent that Blacks and Puerto Ricans are appointed under regular personnel procedures, thus accelerating the date when the target of 50 is reached.

that became vacant within two years of the effective dates of such lists.[16] The stay entered on March 6, 1972, is terminated.

Jurisdiction will be retained for the implementation of the decree.

---

16. The pendency of this lawsuit did not prevent any person standing high on the eligibility lists for patrolman and detective from being appointed or promoted to a vacancy occurring after two years from the effective dates of such lists. Only those who would have been appointed to patrolman or promoted to detective but for this lawsuit and the consent order of March 6, 1972, staying appointments and promotions, are entitled to the benefit of a ruling tolling the validity period of the lists that otherwise would have expired in October, 1972. But they are not entitled to any more protection than that provided by provision 4.