James C. JONES et al., Plaintiffs,

v.

The NEW YORK CITY HUMAN RESOURCES ADMINISTRATION et al., Defendants.

Dorothy WILLIAMS et al., Plaintiffs,

v.

The NEW YORK CITY HUMAN RESOURCES ADMINISTRATION et al., Defendants.

Nos. 73 Civ. 3815, 74 Civ. 91.

United States District Court, S. D. New York.

Jan. 10, 1975.

Supplemental Opinion March 19, 1975.

Covington, Howard, Hagood & Holland, New York City, Edward O. Howard, New York City, of counsel, Deborah Greenberg, Jack Greenberg, Jeffrey Mintz, New York City, for plaintiffs.

Adrian P. Burke, W. Bernard Richland, Corp. Counsel of the City of New York, Paula J. Omansky, Asst. Corp. Counsel, New York City, for defendants.

## OPINION

LASKER, District Judge.

The Human Resources Administration (HRA), a "super-agency" of the City of New York, was created in 1966 in order to coordinate and administer the varied city programs dealing with poverty and social services. Plaintiffs in these two consolidated actions challenge five civil service examinations for positions in the Human Resources Specialist (HRS) Series. They claim that the examinations had a discriminatory impact on Blacks and Hispanics and are not job-related. The named plaintiffs and the class they seek to represent are Black and Hispanic persons [1] who took and failed one or

---

[1]. An unusually large number of provisional employees is involved in the present suits. The large number of provisionals in the three titles under challenge resulted from the exhaustion of civil service lists based on the training and experience examination administered in 1968.

In 1972 three examinations were given to select for each of the three titles in issue: an open competitive exam, on which both HRA employees and members of the public meeting certain general qualifications were eligible to compete; a promotional exam, for which only HRA employees in the next lower grade were eligible; and a specialty exam in Manpower Development and Training (MDT). As noted above, five of these exams are challenged: The open competitive exams for HRS, Sr. HRS and Sup. HRS; and the promotional exams for Sr. HRS and Sup. HRS.

more of the five examinations challenged here. They seek (1) a declaration of the unconstitutionality of the examinations; (2) an injunction against appointments from the lists based on the results of the examinations; (3) an injunction requiring the creation of constitutionally adequate selection procedures for the positions in question and (4) an injunction requiring the permanent appointment of those presently serving as provisional employees to the positions they now occupy. Suit is brought under 42 U.S.C. §§ 1981 and 1983. Jurisdiction is based on 28 U.S.C. § 1343(3) and (4), and the Fifth and Fourteenth Amendments.

The *Jones* plaintiffs challenge examinations Nos. 1631 and 2013, the promotional and open competitive examinations for the position of Supervising Human Resources Specialist (Sup. HRS). The *Williams* plaintiffs attack the constitutionality of the open competitive examination (No. 1097) for Human Resources Specialist (HRS) and both the promotional and open competitive examinations for Senior Human Resources Specialist (Sr. HRS) (Nos. 1626 and 1099). By earlier orders the city has been preliminarily enjoined from making appointments based on any of the examinations.[2]

Trial of the issues in *Jones* has been completed. By stipulation, the parties have supplemented the record developed in *Jones* to enable the court to decide the merits of *Williams.*

Cases of this type, and these suits in particular, involve a prodigious amount of factual matter. Accordingly, we have so far as possible restricted the text of this opinion to substantive discussion, and made extensive use of footnotes for other material.

## I.

The present suits follow in the wake of several recent cases in this Circuit involving civil service examinations alleged to have a disparate impact on minority applicants. See, e. g., Vulcan Society v. Civil Service Commission, (hereafter "Vulcan"), 490 F.2d 387 (2d Cir. 1973), aff'g 360 F.Supp. 1265 (S.D.N.Y.1973); Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission, ("Bridgeport Guardians"), 482 F.2d 1333 (2d Cir. 1973) aff'g in part and rev'g in part, 354 F.Supp. 778 (D.Conn. 1973); Chance v. Board of Examiners, ("Chance"), 458 F.2d 1167 (2d Cir. 1972) aff'g 330 F.Supp. 203 (S.D.N.Y. 1971); Kirkland v. N. Y. State Dep't of Correctional Services, ("Kirkland"), 374 F.Supp. 1361 (S.D.N.Y.1974).

The ground rules established in those decisions require plaintiffs to make a prima facie showing that the examinations have a "racially disproportionate impact," *Vulcan,* 490 F.2d at 391, *Chance,* 458 F.2d at 1175–1176; see also Castro v. Beecher, ("Castro"), 459 F.2d 725, 732 (1st Cir. 1972). Upon such a showing the burden shifts to the defendants to establish that the challenged examinations are job-related, *Vulcan,* 490 F.2d at 391. If it is demonstrated that disparate examination performance results from the candidates' relative qualifications for the job, rather than their race, the examinations are constitutionally adequate, in spite of their racially disparate impact. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L. Ed.2d 158 (1971), *Chance,* 330 F.Supp. at 214. The burden on defendants is "a heavy one," *Chance,* 458 F.2d at 1176, *Guardians,* 482 F.2d at 1337, but is discharged if they "come forward with convincing facts establishing a fit between the qualification and the job." *Vulcan,* 490 F.2d at 393 quoting with approval

---

2. Because permanent appointment to the position of Supervising HRS is a prerequisite to taking the examination for Principal HRS, an injunction was granted at the same time against holding the promotional and open competitive Principal's exams, so that persons who passed the challenged Supervising HRS exam would not be deprived of the opportunity of ultimately taking the Principal's exam on account of the preliminary injunction against appointment from the Supervising HRS list.

*Castro*, 459 F.2d at 732. The defendants are not required to prove that no alternative methods of selection were available to them; the critical question is whether the challenged procedure is constitutionally sound, not whether a better one could have been devised. *Castro*, 459 F.2d at 733, *Vulcan*, 490 F.2d at 393.

## II.

### DISPROPORTIONATE IMPACT

A. As in earlier suits, plaintiffs base their prima facie case on statistics provided by defendants as to the race of passing and failing candidates. However, as to three of the five examinations in question, the data is incomplete because HRA does not keep records of the race of candidates who were not HRA employees at the time they took an examination. Neither side suggested or undertook, and the court did not order, a survey to determine the race of those not identified in HRA's records.[3] Accordingly, as to 2013 the ethnicity of only 51% of the candidates is known; for 1097 and 1099 the figures are 54% and 60% respectively. The available statistics are set forth in the chart below:

### Challenged Exam No. 1631 (Sup. HRS) (Prom.)

|  | Pass | Fail | Total | % Passing |
|---|---|---|---|---|
| Blacks | 12 | 57 | 69 | 17% |
| Whites | 28 | 24 | 52 | 54% |
| Hispanics | 3 | 13 | 16 | 19% |
| Unknown | — | 1 | 1 |  |
|  | 43 | 95 | 138 |  |

### Challenged Exam No. 2013 (Sup. HRS) (OC)

|  | Pass | Fail | Total | % Passing |
|---|---|---|---|---|
| Blacks | 39 | 208 | 247 | 16% |
| Whites | 125 | 108 | 233 | 54% |
| Hispanics | 3 | 17 | 20 | 15% |
| Others | 5 | 3 | 8 | 63% |
| Subtotal | 172 | 336 | 508 |  |
| Unknown | 183 | 303 | 486 | 38% |
|  | 355 | 639 | 994 |  |

3. The adequacy of plaintiffs' statistical case was raised for the first time in defendants' post-trial memorandum. It was not raised on the motions for a preliminary injunction in *Jones* (September, 1973) or *Williams* (December, 1973 and January, 1974); nor did defendants move to dismiss the complaint at the close of plaintiffs' case at trial. We attach no particular significance to the timing of defendants' attack, except to note that it comes after our decision in Hill v. Human Resources Administration, 74 Civ. 1150 (March 29, 1974), in which we denied a preliminary injunction because of the apparent undependability there of plaintiffs' statistics.

Plaintiffs suggest that our findings of statistical impact on the motions for preliminary injunction in *Jones* and *Williams* are the "law of the case," by which defendants (and the court) are bound. Putting aside the fact that such motions decide only the probability of success of the merits rather than the merits themselves, we believe questions such as the one before us should not, after trial, be decided on the less deliberate basis upon which preliminary relief is normally predicated.

Upon consideration of the argument raised by defendants' post-trial memorandum, the court directed the parties to supplement the trial record by furnishing affidavits of statistical experts as to the significance of the statistical data in the trial record.

Challenged Exam No. 1626 (Sr. HRS) (Prom.)

|          | Passed | Failed | Total | % Passing |
|----------|--------|--------|-------|-----------|
| Blacks   | 11     | 51     | 62    | 18%       |
| Whites   | 30     | 4      | 34    | 88%       |
| Hispanic | 3      | 5      | 8     | 37%       |
| Other    | —      | 2      | 2     |           |
|          | 44     | 62     | 106   |           |

Challenged Exam No. 1099 (Sr. HRS) (OC)

|          | Passed | Failed | Total | % Passing |
|----------|--------|--------|-------|-----------|
| Blacks   | 56     | 165    | 221   | 26%       |
| Whites   | 101    | 54     | 155   | 65%       |
| Hispanic | 8      | 22     | 30    | 27%       |
| Subtotal | 165    | 241    | 406   |           |
| Unknown  | 90     | 187    | 277   | 32%       |
|          | 255    | 428    | 683   |           |

Challenged Exam No. 1097 (HRS) (OC)

|           | Passed | Failed | Total | % Passing |
|-----------|--------|--------|-------|-----------|
| Blacks    | 55     | 120    | 175   | 31%       |
| Whites    | 59     | 56     | 115   | 51%       |
| Hispanics | 7      | 29     | 36    | 19%       |
| Other     | 1      | 1      | 2     |           |
| Subtotal  | 122    | 206    | 328   |           |
| Unknown   | 78     | 200    | 278   | 28%       |
|           | 200    | 406    | 606   |           |

Putting aside for the moment the question of the representativeness of the available data for Examinations No. 2013, 1099 and 1097, the existing figures for all five examinations clearly indicate a disparity between the passing rates of white and minority candidates in excess of the 1.5 to 1 ratio which *Chance* held sufficient to establish a prima facie case. 330 F.Supp. at 210.[4]

As to No. 1631, for which complete data is available, whites passed at a rate of approximately three times that of Blacks and Hispanics (54% to 17% and 19% respectively). On Examination No. 1626, for which the data is also complete, whites passed at a rate of about five times that of Blacks and 2.4 times the rate of Hispanics (88% to 18% and 37%, respectively).

The available figures for No. 1099 indicate that whites passed at 2.5 times the rate of Blacks and Hispanics (65% to 26% and 25%, respectively). As to No. 2013, whites passed at over three times the rate of Blacks and Hispanics (54% to 16% and 15%, respectively). Whites passed No. 1097 at a rate of 1.7 times that of Blacks and 2.7 that of Hispanics (51% to 31% and 19%, respectively). In sum, the figures for all five examinations indicate a disparate impact in favor of white candidates in excess of the 1.5 to 1 ratio that carried the day for plaintiffs in *Chance*.

4. In *Guardians*, whites passed at 3.5 times the rate for Blacks and Hispanics, 354 F. Supp. at 784; in *Vulcan*, whites scored high enough to have a chance for appointment at 2.8 times the rate of Blacks and Hispanics, 360 F.Supp. at 1269. In *Kirkland*, whites passed at a rate of about 4 times that of Blacks and 2.5 times that of Hispanics. 374 F.Supp. at 1366–1367.

Not surprisingly, defendants' most vigorously pressed objection to plaintiffs' prima facie case is the incompleteness of the data for Nos. 2013, 1099 and 1097. They argue that in the absence of complete and reliable data as to the race and passing rate of all, or substantially all, candidates on these exams, plaintiffs have failed to establish a prima facie case.[5] Defendants make the related argument that even assuming that the complete figures for Nos. 1631 and 1625 show substantial disparate impact as to those exams, the inconclusive nature of the statistics for the other three tests and plaintiffs' failure to challenge two

---

5. In earlier cases, the court had before it substantially complete statistics as to the racial makeup of the group taking the tests. In *Chance* the parties compiled a statistical survey to provide pass-fail data covering fifty examinations given over a period of seven years, for supervisory positions in the New York City school system. The court there did not accord significance to figures for 41 of the 50 examinations, on which a total of only 83 minority candidates competed—clearly too small a sample on which to base a finding of disparate impact. Instead the court relied on figures from the nine examinations taken by ten or more minority candidates, finding that plaintiffs had established a prima facie case. 330 F.Supp. at 209–214. As to all 6,201 candidates taking the 50 examinations in *Chance* (5,910 of whom were identified by race), white candidates passed at a rate of almost 1½ times the rate of minority candidates (44.3% to 31.4%).

In Bridgeport Guardians v. Bridgeport Civil Service Commission, *supra*, Vulcan Society v. Civil Service Commission, *supra*, and Kirkland v. Department of Correctional Services, *supra*, statistics as to the racial makeup and pass-fail rates of examined groups were complete or virtually complete. In Hill v. N.Y.C. Human Resources Administration, No. 74 Civ. 1150 (S.D.N.Y. March 29, 1974), aff'd 493 F.2d 1397 (2d Cir. 1974), this court declined to grant a preliminary injunction in a suit challenging three examinations. As to the first test, data were available for only 9% of those who passed and 3% of those who failed, and in any event, the available statistics did not indicate substantial disparate impact. On the second test the ethnic identity of 44% of passers and 16% of failures were known, with whites passing at a rate of about 1.5 times the rate of minorities. On the third test the ethnic identity of 28% of passers and 16% of failures were known; whites passed at about the same rate as Hispanics and about 1.5 times the rate of Blacks.

Defendants cite *Hill* as authority that anything less than complete statistics is too little on which to base a prima facie case on the merits. We disagree with this reading of our decision there. First, comparison of the figures available in *Hill* with those now before the court shows that the present plaintiffs have presented data as to a considerably higher proportion of candidates than those in *Hill*: as to examination No. 2013, the ethnic identity of 51% (49% of those passing and 53% of those failing) is known; for Nos. 1099 and 1093 the figures are 60% (64% of those passing and 56% of those failing), respectively. Moreover, substantial disparate impact was not shown, even as to the available samples, in all three examinations in *Hill*. The reverse is true in the present case because the available samples with one exception indicate disparate impact of far greater magnitude than the 1.5 to 1 found to be sufficient in *Chance*.

Furthermore, the *Hill* decision merely determined a request for preliminary relief which classically calls for the application of different legal standards than a trial on the merits and which, in cases like the present one, does not permit the deliberate consideration appropriate to issues of substantial public importance which is possible after trial.

In addition to *Hill*, defendants cite in support of their attack on plaintiffs' prima facie case Gonzalez v. City of New York, 4 E. P.D. ¶ 7867 (S.D.N.Y.1972) and Boston Chapter, N.A.A.C.P. v. Beecher, 371 F.Supp. 507 (D.Mass.1974). The cases are inapposite. *Gonzalez* involved an attack on a civil service examination by five minority professional employees, four of whom failed and one of whom did not take the exam. The court did not have before it statistics as to the race of *anyone* who took the exam, apart from plaintiffs themselves. In *Beecher* the race of 84% of the candidates (3,181 of 3,790) was known through voluntary self-reporting, 3,089 of these (97%) were whites, who passed at a rate of 54%; the rate for 15 candidates identifying themselves as "Negroid" was 56%; for 18 "Blacks," 44.5%; for 15 Hispanics, 33%; and for the combined minorities 39%. In view of the small number of minority candidates, and a white rate exceeding the combined minority rate by only 1.4 to 1, the court relied not on the test results, but on the disparity between percentage representation of minorities in the general populations in the fire departments of various cities, in concluding that plaintiffs had not established a prima facie case.

additional exams in the HRS series whose results are inconclusive as to impact, indicate that the class did not fare significantly worse than whites on the HRS series *on the whole,* which defendants claim is the proper standard. For the reasons stated below, we find that neither argument has merit and that plaintiffs have established a prima facie case as to all five exams.

B. Although neither side produced a statistical expert at trial, experts for each of the parties have submitted affidavits as to the significance of the statistics in the record.

Plaintiffs' expert, Richard S. Barrett, is a nationally recognized expert in the field of testing. His affidavit sets forth certain computations using the Chi-Square Test, a generally accepted means of analyzing statistics of the type used in lawsuits such as this one. See *Chance,* 458 F.2d at 1173, 330 F.Supp. at 212. The purpose of the Chi-Square Test, as described by Barrett, is to determine whether a differential pass rate for two or more groups arises from a real difference in the performance of the groups, or from random differences arising from chance variation in the sample. (Barrett affidavit, dated November 4, 1974, Paragraph 4.) In this case, the Chi-Square Test attempts to determine whether the lower passing rates for Blacks and Hispanics resulted from mere chance, or from a factor related to race.

Barrett's computations, which are based on the complete statistics for Nos. 1631 and 1626, and on the available statistics for Nos. 2013, 1099 and 1097, are set forth below:

| Examination | Comparison | Chi-Square |
|---|---|---|
| 1631 | Black v. White | 17.81 |
| | Minority v. White | 19.63 |
| 2013 | Black v. White | 76.40 |
| | Minority v. White | 80.42 |
| 1626 | Black v. White | 44.60 |
| | Minority v. White | 43.65 |
| 1099 | Black v. White | 59.40 |
| | Minority v. White | 62.49 |
| 1097 | Black v. White | 11.49 |
| | Minority v. White | 15.32 |

Barrett states that a Chi-Square of 6.-64 will occur less than one time in 100 as the result of chance, and that conventional statistical tables do not include values as large as those shown in the chart "because their occurrence as chance events is too small to be taken seriously." (Barrett affidavit, Paragraph 6) Accordingly, as to Nos. 1631 and 1626, for which complete statistics are available, it is readily apparent that plaintiffs have established disproportionate impact not resulting from chance.

The question that is unresolved by the Chi-Square analysis set forth above is whether the data for the entire group of candidates on Nos. 2013, 1097 and 1099 would show the same results as Barrett calculated on the basis of the known candidates on those exams. On this question Barrett states:

"Strictly speaking such a determination can be made only if there is reason to believe that those whose identity is not known are a random sample of the total group. There is, of course, no way to make this determination. However, the size of the Chi-Square statistics reported above [which were computed on the basis of the known group only] is so great

that those whose race or ethnicity is unknown would have to differ in an unrealistically large degree from those whose identity is known to lead to the conclusion that the tests are free from adverse impact." (Barrett affidavit, Paragraph 7).

Although we recognize that in cases such as this, we may walk through statistical mine fields, Barrett's conclusions do accord with common sense. On No. 2013, for example, for which the ethnicity of 51% of candidates is known (the HRA population) [5a] whites passed at over 3 times the rate of Blacks and Hispanics. We find it distinctly improbable that minority group members in the non-HRA (unknown) group would outperform non-HRA whites on the same examination to the extraordinary degree necessary to bring the overall passing rates for minorities and whites into rough parity. This conclusion is buttressed by Barrett's observation that Nos. 2013, 1097 and 1099 are "made up of items of the type on which Blacks and Hispanics generally do more poorly than whites." (Barrett affidavit, Paragraph 8.) Cf. *Griggs*, 401 U.S. at 430, 91 S.Ct. 849. We reach the same conclusion as to No. 1097, which whites passed at a rate of 1.7 that of Blacks and 2.7 times that of Hispanics. The ethnicity and pass-fail results of 54% of the candidates are known. Consequently, minorities in the non-HRA group would have to outscore non-HRA whites substantially on that examination to negate the strong showing of adverse impact. The same conclusion applies to Examination No. 1099 which whites passed at a rate 2.5 that of minority candidates, and as to which the ethnicity of 60% of the candidates is known.

■■ In sum, we find that the data of record meets the standard to establish a prima facie case as articulated by Judge Friendly in *Vulcan*:

"It may well be that the cited figures and other more peripheral data relied on by the district judge did not prove a racially disproportionate impact with complete mathematical certainty. But there is no requirement that they should. 'Certainty generally is illusion, and repose is not the destiny of man.' We must not forget the limited office of the finding that black and Hispanic candidates did significantly worse in the examination than others. That does not at all decide the case; it simply places on the defendants a burden of justification which they should not be unwilling to assume." 490 F.2d at 393.[6]

The affidavit of defendants' statistical expert, Gus W. Grammas, is not inconsistent with our conclusions as to 2013, 1099 and 1097.[7] It states, and we agree,

---

5a. As used here, the term "HRA population" indicates candidates who were employed by HRA at the time of the examination and whose ethnic identity is known. The "unknown" group in Nos. 2013, 1099 and 1097 is made up of those who were not employees of HRA. In this Opinion they are termed the "non-HRA population".

6. The remarks of Judge Weinfeld, the trial judge in *Vulcan*, are also apposite here:
"... Where public employment practices are under challenge defendants usually have superior access to relevant statistical data than plaintiffs and ... the latter will often be dependent on the efforts and good faith of the former. In addition, statistical evidence by its very nature deals with probabilities rather than certainties. All that can be required of methods employed in gathering such evidence is that they assure reasonably accu-

rate findings. Absolute perfection usually is not attainable in this kind of endeavor. [Footnote omitted] The right of racial minorities to demand that the state justify even de facto discrimination may not be so restricted that it exists in principle but not in fact." *Vulcan*, 360 F.Supp. at 1270.

7. Grammas postulates a set of assumptions about the non-HRA populations on 2013, 1097 and 1099 which he tests against the only known fact about those populations, the overall pass-rate of the non-HRA groups on each exam. Grammas' three assumptions are (1) that the whites, Blacks and Hispanics in the non-HRA populations are represented in the same proportions as the HRA (known) populations for each exam; (2) that the pass-fail rates on each exam are the same for both the HRA and non-HRA

that neither the precise racial make-up nor the pass-fail rates of the non-HRA groups in Nos. 2013, 1097 and 1099 can be statistically inferred from the data about the HRA groups whose ethnicity and pass-fail rates are known because the known group (HRA employees) is not a random or representative sample of the unknown (non-HRA) employees. (Grammas affidavit, dated November. 7, 1974, Paragraphs 6–7, 20–23.) But that fact is not inconsistent with our conclusion. Strictly speaking, the precise racial make-up of the unknown groups in Nos. 2013, 1099 and 1097 is irrelevant; the issue rather is whether there is any realistic likelihood that non-HRA minority candidates—however many or few— fared well enough in comparison to non-HRA whites to offset the startling imbalance in favor of whites among the known (HRA) candidates. We conclude there is no such likelihood.

Defendants' second attack on plaintiffs' prima facie case can be disposed of more easily. They claim that, notwithstanding plaintiffs' prima facie showing as to the five examinations challenged in this lawsuit, they should not be permitted to choose among the exams in the HRS series, challenging only those in which minorities performed worst. Nei-

groups and (3) that the non-HRA candidates are a random sample of the total population which was eligible to take the open competitive examinations, #2013, 1097 and 1099.

Based on these assumptions, for which there is concededly no support in the record, Grammas computed hypothetical pass-fail rates for Blacks, whites and Hispanics in the non-HRA groups taking exams No. 2013, 1099 and 1097. He then compared these with the observed or real pass rates of each ethnic group on those examinations to see whether the hypothetical pass rates for the unknown groups accorded with the observed pass rates for the known group.

As to No. 2013, based on the assumptions described above, Grammas concluded that the hypothesized and observed rates are the same; i. e., that it is statistically probable (based on a 95% level of confidence) that disparate impact as to the unknown group was of the same general magnitude as the impact on the known group.

As to Nos. 1099 and 1097, for which Grammas made the same assumptions, the observed and hypothesized rates were significantly different, leading him to reject the hypothesis that the differential impact was the same for the unknown group as for the known (observed) group. However, Grammas does not indicate the *degree* of probability that the observed and hypothesized rates were the same, other than to indicate that it is something less than 95% probable. (Grammas affidavit, Paragraph 15). This fact of course leaves open the possibility, confirmed by Barrett, that although it is not statistically certain that the non-HRA groups showed the same disparate impact as the HRA groups, it is indeed likely that they would.

There are additional reasons why Grammas' computations are of limited relevance in determining the legal question before us: Grammas bases his computations of hypothetical pass-fail rates for the non-HRA group on three assumptions "which plaintiffs would need to make in order to establish disparate impact on the non-HRA population." (Grammas affidavit, Paragraph 9) This is clearly not the case. First, as noted above, it is not necessary that the non-HRA population have precisely the same racial make-up as the HRA population for disparate impact to exist as to the non-HRA population; the rate at which minority candidates pass does not hinge on the number of them appearing for the exam. Nor is it necessary that the pass-fail rates for minorities in the non-HRA group be shown to be substantially identical to those in the HRA group in order to establish disparate impact. Non-HRA minorities could pass the exams at far higher rates than did the HRA minorities and still not dissipate entirely the minimum requisite prima facie showing of 1.5 to 1 established in *Chance*.

Third, it is not necessary that the non-HRA candidates were a "random sample of the total population which was eligible to take the open competitive examination." (Grammas affidavit, Paragraph 9) The more relevant question is whether the known HRA group is a reasonably representative sample of the combined HRA-non-HRA population that appeared for 2013, 1099 and 1097.

In sum, in view of the startling evidence of disparate impact among HRA employees and the complete lack of evidence suggesting that HRA minorities perform comparatively worse relative to HRA whites than their non-HRA counterparts, we conclude that the available figures for Nos. 2013, 1099 and 1097 are sufficient to establish a prima facie case.

ther the facts nor the law support defendants' argument.

Of the nine examinations in the HRS series, five are challenged here. Plaintiffs do not challenge the four other exams in the series; however, the results for three of these are of record: the Sr. HRS (MDT) open competitive exam (No. 1094), the HRS promotional exam (No. 1625), and the HRS (MDT) open competitive (No. 1095). The statistics for these are indicated in the chart below:

### Sr. HRS (MDT) Open Competitive Exam No. 1094

|           | Passed | Failed | Total | % Passing |
|-----------|--------|--------|-------|-----------|
| Blacks    | 18     | 41     | 59    | 31%       |
| Whites    | 5      | 10     | 15    | 33%       |
| Hispanics | 7      | 15     | 22    | 32%       |
| Other     | —      | 1      | 1     |           |
| Subtotal  | 30     | 67     | 97    |           |
| Unknown   | 18     | 78     | 96    | 19%       |
|           | 48     | 145    | 193   |           |

### HRS Promotional Exam No. 1625

|           | Passed | Failed | Total | % Passing |
|-----------|--------|--------|-------|-----------|
| Blacks    | 13     | 36     | 49    | 27%       |
| Whites    | 1      | 4      | 5     | 20%       |
| Hispanics | —      | 4      | 4     |           |
|           | 14     | 44     | ¬ 58  |           |

### HRS (MDT) Open Competitive Exam No. 1095

|               | Passed | Failed | Total |
|---------------|--------|--------|-------|
| Black         | 12     | 44     | 56    |
| White         | 8      | 9      | 17    |
| Hispanic      | 7      | 16     | 23    |
| Subtotal      | 27     | 69     | 96    |
| No ethic info | 12     | 74     | 86    |
|               | 39     | 143    | 182   |

As to 1094 and 1625, it is evident that, although the results suggest roughly equal passing rates, the samples are too small to be valuable. As to No. 1094, if only one more white had passed, the passing rate for whites would rise from 33% to 40%; if two more whites had passed the rate would be 47%, as compared with a 31% rate for Blacks. These figures (47% to 31%) compare favorably with the 1.5 to 1 ratio in *Chance*. As to No. 1625, if only one more white had passed, the rate would be 40% for whites, as compared with 27% and 0% for Blacks and Hispanics, respectively. The available figures show that as to 1095, only 17 whites took the exam as compared to 56 Blacks and 23 Hispanics, but in any event whites passed at over two times the rate of Blacks and 1.5 the rate of Hispanics (47% to 21% and 30%).

Comparison of the aggregate available figures for the five exams under chal-

lenge with the aggregate figures for all eight examinations demonstrates the shaky factual basis for defendants' argument.

### AGGREGATE RESULTS ON 5 EXAMS

|  | Passed | Failed | Total | % Passing |
|---|---|---|---|---|
| Blacks | 173 | 601 | 774 | 22% |
| Whites | 343 | 246 | 589 | 58% |
| Hispanics | 24 | 86 | 110 | 22% |

As the chart indicates whites passed at nearly 3 times the rate of minorities when the challenged exams are considered in the aggregate.

When the results for the three examinations not challenged by plaintiffs are added into the aggregate computation, the overall pass rates are not significantly altered:

### AGGREGATE RESULTS ON EIGHT EXAMS

|  | Passed | Failed | Total | % Passing |
|---|---|---|---|---|
| Blacks | 216 | 732 | 948 | 23% |
| Whites | 357 | 269 | 626 | 59% |
| Hispanics | 38 | 121 | 159 | 24% |

We regard these figures as sufficient proof that plaintiffs' class performed significantly worse than whites and that the disparity is not the result of chance.

■ In any event, defendants' argument that the plaintiffs should not be permitted to challenge only those exams whose results show disparate impact is invalid as a matter of law. In *Vulcan*, defendants challenged plaintiffs' statistical case because it was based on a single examination, which they claimed was insufficient to be meaningful. In rejecting the argument Judge Weinfeld observed:

"The consequence of relying upon one examination is only that any finding of discrimination and the relief to be granted will necessarily be restricted to the scope of the proof. The evidence presented was more than adequate to support a finding of discriminatory impact." 360 F.Supp. at 1271. The observation applies with equal force in the case at hand.

### III.

### JOB RELATEDNESS

As noted earlier, defendants have the burden of justifying the use of the challenged examinations by proving that they are job-related. *Vulcan*, 470 F.2d at 391, and that the differential impact indicated by the statistics results from variance in qualifications for the job, rather than race. Griggs v. Duke Power Co., *supra*, 401 U.S. at 430–431, 91 S.Ct. 849 (1971), *Chance*, 330 F.Supp. at 214. This burden is discharged if the city "come[s] forward with convincing facts establishing a fit between the qualification and the job." *Vulcan*, 490 F.2d at 393, quoting *Castro*, 459 F.2d at 732; see also *Guardians*, 482 F.2d at 1337, *Chance*, 458 F.2d at 1176.

■ A. Case law in this Circuit recognizes three methods for validating an examination as job-related: criterion-related validation, construct validation and content validation. See, e. g., *Vulcan*,

490 F.2d at 394–396; *Guardians*, 482 F.2d at 1337–1338 and 354 F.Supp. at 788–789; *Kirkland*, 374 F.Supp. at 1370–1372. Criterion-related validation is a process by which relative performance on an examination is compared with relative performance on the job, either by "pre-testing" a group of current employees or by subsequent on-the-job evaluation of successful candidates. See *Vulcan*, 360 F.Supp. at 1273. This method is considered more effective than other validation methods because it clearly establishes the degree of correlation between successful examination performance and successful job performance. *Guardians*, 482 F.2d at 1337 and 354 F.Supp. at 788. However, no case in this Circuit has held that a showing of criterion validity is required for defendants to satisfy their burden of proving job-relatedness, if the test can be shown to have been validated by another method. See *Vulcan*, 490 F.2d at 395.

The second recognized method of validation is construct validation, which involves "identification of the general mental and psychological traits believed necessary to successful performance of the job in question," *Vulcan*, 490 F.2d at 395, and the construction of an examination which tests for these qualities. Defendants do not contend that they validated the examinations by either criterion validation or construct validation.

Consequently, defendants' proof on the issue of job-relatedness hinges on whether the examinations are "content valid." Judge Weinfeld described this method in *Vulcan*:

"An examination has content validity if the content of the examination matches the content of the job. For a test to be content valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job." 360 F.Supp. at 1274 (footnotes omitted). See also, *Vulcan*, 490 F.2d at 395; *Guardians*, 482 F.2d at 1338; *Kirkland*, 374 F.Supp. at 1372.

Cases in this Circuit have recognized the difficulties of applying sophisticated, and unfamiliar, principles of psychometrics to jobs about which the trier of fact has only superficial knowledge, and have dealt with the problem on a pragmatic basis. Judge Friendly's approving description of the approach Judge Weinfeld used in *Vulcan* sets the tone:

"Instead of burying himself in a question-by-question analysis of Exam 0159 to determine if the test had construct or content validity, the judge noted that it was critical to each of the validation schemes that the examination be carefully prepared with a keen awareness of the need to design questions to test for particular traits or abilities that had been determined to be relevant to the job. As we read his opinion, the judge developed a sort of sliding scale for evaluating the examination, wherein the poorer the quality of the test preparation, the greater must be the showing that the examination was properly job-related, and *vice* versa. This was the point he made in saying that a showing of poor preparation of an examination entails the need of 'the most convincing testimony as to job-relatedness.' The judge's approach makes excellent sense to us. If an examination has been badly prepared, the chance that it will turn out to be job-related is small. *Per contra*, careful preparation gives ground for an inference, rebuttable to be sure, that success has been achieved. A principle of this sort is useful in lessening the burden of judicial examination-reading and the risk that a court will fall into error in umpiring a battle of experts who speak a language it does not fully understand. See *Chance, supra*, 458 F.2d at 1173." 490 F.2d at 395–396.

B. The initial step in the construction of a content-valid examination is the "job-analysis." Its purpose is to identify the knowledge, skills and abilities required for performance of the job. Such an analysis involves the isolation of the qualities most critical to job performance, an evaluation or weighing of their importance relative to one another, and a determination of the level of competence required as to each of them. *Vulcan,* 360 F.Supp. at 1274, *Kirkland,* 374 F.Supp. at 1373. Obviously, the adequacy of the job analysis is crucial to a content-valid examination; unless the analysis accurately describes the "content" of the job, the content of the examination based on it is likely to be seriously distorted.

Accordingly, for defendants to sustain their burden of proof as to the content validity of the examinations in issue, they must show,

"not only that the knowledge, skills and abilities tested for . . . coincide with some of the knowledge, skills and abilities required successfully to perform on the job, but also that 1) the attributes selected for examination are critical and not merely peripherally related to successful job performance; 2) the various portions of the examination are accurately weighted to reflect the relative importance to the job of the attributes for which they test; and 3) the level of difficulty of the exam matches the level of difficulty for the job." *Kirkland,* 374 F.Supp. at 1372.

Leonard Rosenberg prepared the job analysis for the five challenged examinations. He has been employed since 1956 in the Department of Personnel in New York City, and has had varied experience in the personnel field, primarily in the area of classification of civil service titles. Since 1970 he has been assigned to the Bureau of Examinations, where he is responsible for all personnel matters relating to the HRS Series of titles. Although his earlier work had involved a large number of "desk audits" to determine whether a particular city employee was performing duties appropriate to his title, (Tr. 177), the job analysis for the challenged examinations [8] was the first he had undertaken for purposes of exam construction. (Tr. 230)

Rosenberg's job analysis for the title of Sup. HRS [9] was based on a series of visits to various HRA agencies and work locations during the period October 1–7, 1971. At the time of the visits, there were about 180 Sup. HRS provisionals scattered throughout HRA. (Tr. 374) However, to safeguard against leakage of information relating to the forthcoming exams, and pursuant to city policy, Rosenberg advised HRA officials that he wished to confer only with permanent Sup. HRS's. (Tr. 193) At the time of the audit there were seven permanent Sup. HRS incumbents, of whom Rosenberg interviewed four (Tr. 226). Beyond that he spoke to several HRA employees in higher titles and observed an unspecified number of HRA employees as they went about their work. (Tr. 224)

---

8. Although each examination under challenge included both written and oral components, and seniority of employees was given some weight on the promotional exams, plaintiffs concentrate their attack on the written portions only. Such an approach is appropriate because only candidates who passed the written test were given the oral exam or graded on seniority. Moreover, virtually everyone passed the oral examination and its only effect on the appointment lists was to raise or lower a candidate a few places on the list. It appears that no member of plaintiffs' class would be denied appointment as a result of the oral exam or seniority rating. See *Vulcan,* 360 F.Supp. at 1271–1272.

9. By stipulation dated April 30, 1974, the parties in *Williams* agreed that, if called, the witnesses who testified on behalf of defendants in *Jones* as to the job-relatedness of examinations 1631 and 2013 for the position of Sup. HRS would testify to the same effect with regard to the three examinations challenged in *Williams,* Nos. 1097, 1626 and 1099. Accordingly, we do not distinguish among the five examinations under challenge in our discussion of their preparation and job-relatedness.

Defendants' Exhibit F is the two-page written job analysis which Rosenberg prepared on the basis of his visits.[10]

Rosenberg also prepared a one page test plan[11] (Defendants' Exhibit G1) based on the job analysis. The test plan lists eight areas to be covered on the Sup. HRS examination which are substantially identical to the eight knowledges and skills identified in the job analysis.

For the reasons discussed below, we find that the job analysis and test plan prepared by the city fall short of professional standards as delineated by the testimony and applicable case law. First, the evidence establishes that Rosenberg's visits and interviews at work locations of HRA did not cover the full spectrum of tasks performed by those in the title of Sup. HRS. It is undisputed that Rosenberg did not interview people in most of the sub-agencies of HRA including, for example, the Agency for Child Development and the Youth Services Administration (Tr. 235, 381; see Defendants' Exhibit F). Consequently, the job analysis cannot—and on the face of it does not—[12] purport to be a complete profile of the job title. Without question, the city guidelines which prevented Rosenberg from interviewing provisionals in the course of his visits to HRA made a thorough job analysis nearly impossible. Of close to 200 employees in the title of Sup. HRS (about

10. The first page lists several work locations Rosenberg visited and the names of the eight HRA employees (four permanent Sup. HRS's and four employees in superior positions) he interviewed about the job of Sup. HRS. The second page lists eighteen "Examples of Typical Tasks" which Rosenberg observed in the course of the audit, including, for instance, "supervision of staff," "solve problems of staff," "conduct staff meeting for control and safety purposes," "negotiations for funds to permit on-the-job development of disadvantaged residents of poverty areas of N.Y.C." Each example is followed by several Roman numerals which designate the particular "knowledge and skills" Rosenberg found to be required in the performance of each task. The eight "knowledges and skills" include "Responsibilities of H.R.A. Central and its constituent agencies and relevant outside agencies," "Familiarity with developments and problems in programs affecting human resources and the amelioration or elimination of poverty," "Ability to supervise, direct and develop staff." According to the job analysis most of the typical tasks observed by Rosenberg require at least five of the listed "knowledges and skills"; some required all eight.

11. In pertinent part, the test plan is as follows:

| Areas to be Covered | Relative Emphasis |
|---|---|
| I. Function of H.R.A. its constituent agencies and other relevant public and private agencies. | 15% |
| II. Current Developments and problems in the field of human services. | 10% |
| III. Community relations and organization. | 10% |
| IV. Judgment in on-the-job situations involving office services, payroll, budget and personnel. | 20% |
| V. Techniques of staff development, supervision and guidance. | 20% |
| VI. Machine, equipment and supply purchase, usage and management including safety. | 5% |
| VII. Language usage including vocabulary and reading comprehension. | 10% |
| VIII. Arithmetic computations and interpretations of tables, charts, and graphs. | 10% |
| | 100% |

12. See note 10, *supra.*

180 provisionals and 7 permanent incumbents), the city's policy authorized Rosenberg to speak only to the seven permanent incumbents, and, in fact, he spoke to only four of these.[13]

The evidence establishes that a sample of four employees in the Sup. HRS title is insufficient to provide a full view of the job of Sup. HRS. All the witnesses agreed that it is difficult to imagine job titles broader than those in the HRS Series.[14] (see, e. g. Tr. 275, 381–382, 393, 421, 425, 497–498, 501–502)' Employees holding the generic title Sup. HRS may do jobs ranging from payroll and purchasing of supplies to public relations or program planning. (Defendants' Exhibit F) in twenty different kinds of programs (Tr. 381). Moreover, although there are a number of small clusters of Sup. HRS's who do approximately the same kind of work, there are no large-sub-groups capable of easy categorization. (Tr. 382) In view of the variety of HRA activities, and work

tasks associated with them, an insufficient interview sample would seriously distort the overall picture [15] (Tr. 572–575).

Defendants called two witnesses as to the adequacy of the job analysis. Everett Williams is a psychologist employed by the Educational Testing Service in Princetown, New Jersey. Mildred Katzell is a psychologist specializing in the field of measurement and evaluation. Their conclusion that the job analysis was professionally adequate (Tr. 409, 498) must be viewed in light of their criticism of the small sample and the restrictive city policy which caused it. Katzell conceded that "it might have been desirable to have a larger sampling of the total gamut of the types of positions that are circumscribed by this title." (Tr. 433–34) Williams testified that interviewing four out of seven permanent Sup. HRS's was "very adequate in terms of a sample percentage," but that "you typically would want to have

---

13. His failure to speak at least to all seven permanent Sup. HRS's is unexplained. We note, however, that Rosenberg's visits were arranged, at his request, by HRA officials; and that Rosenberg appears to have given no specific instructions regarding the number and variety of personnel he wished to see. (Tr. 192–195).

14. Some idea of the breadth of HRA's activities will aid in understanding the variety of tasks performed by those in the three generic titles of Specialist, Supervising Specialist and Senior Specialist—and the corresponding difficulty of developing job related examinations to select for those titles.

The purpose of HRA as established in 1966 was to effect a citywide consolidation of programs in the areas of public assistance, social services, manpower development and employment and community action. The 35 year old Department of Social Services was HRA's major component. DSS included three federally-funded Bureaus of Public Assistance, Child Welfare and Special Services. In addition, the then Mayor Lindsay created, and placed within HRA, two other agencies: The Manpower and Career Development Agency, which combined all city manpower and employment services, and the Community Development Agency, which provided technical staff assistance for the Federal Community Action Program governed by the Council Against Poverty.

Later additions to HRA included the Youth Services Agency, created in 1967, and the Agency for Child Development, a 1971 consolidation of Headstart and City Day Care Programs. See Reorganization Plan for the City of New York Human Resources Administration (Defendants' Exhibit H).

15. A concrete example of such possible distortion was mentioned several times in the course of the trial. Although questions relating to supervision of staff were given the maximum weight (20%) on the test plan, defendants' witness Harold Yourmans, Director of Labor Relations for HRA, testified that only 60–65% of those in the Sup. HRS title do any supervision at all (Tr. 341–2, 391) Rosenberg testified that he thought "most" Sup. HRS's have supervision responsibility, but did not supply a figure (Tr. 240–241) Of the four permanent incumbents he interviewed, three had duties involving supervision of other employees; one had little or none. (Tr. 240) Although the 20% weight Rosenberg assigned to the "ability to supervise, develop and direct staff" roughly reflects his observations, as far as they went, it is evident that had Rosenberg seen, for example, one more or one less Sup. HRS with supervisory duties, the job analysis, test plan and examination might well have been weighted differently.

more observation points if there are these wide differences [in tasks performed], usually between 10% to 25% of the total class." (Tr. 498–499) Williams made it clear that his opinion that the job analysis was adequate might change if the city's restrictions on interviewing provisionals were lifted. (Tr. 499–500) But the professional and legal inadequacy of a job analysis is not cured simply because there is an extrinsic explanation for it, such as the city's policy here. In view of the wide variety of tasks performed by those in the title of Sup. HRS and the large number and varied type of sub-agencies within HRA, it is reasonable to assume that an adequate sample would approach the upper end of the 10–25% spectrum mentioned by Williams (Tr. 581–582). Accordingly, we regard the 2% sample used in the job analysis for Sup. HRS (four of a group of about 180) as critically insufficient.

Defendants argue that Rosenberg's prior experience with HRA matters, his interviews with employees in titles higher than Sup. HRS and his observations of many other employees whom he did not interview cure any deficiency in the sample. We disagree. Assuming that Rosenberg's prior experience in HRA matters gave him a general knowledge of the Sup. HRS title, his private knowledge about HRA, however extensive, cannot have been of value to persons constructing the examination unless committed to writing in the job analysis. See *Kirkland,* 374 F.Supp. at 1373–1374. But that is not the case here; on its face, the written job analysis purports to be based only on information gathered from Rosenberg's visits to HRA pursuant to his assignment to prepare the particular examinations in issue.

In any event, the value of Rosenberg's prior experience in personnel matters relating to HRA ought not be overestimated since, as noted earlier, it occurred primarily in the area of classification of job titles (Tr. 176–179, 218–222). Such work demands substantially different methods than those required for a thorough job analysis to be used as the foundation of an examination (Tr. 230–231, 570–571, 577–579). Moreover, although the job analyses Rosenberg prepared for the three job titles in issue were the first he had done for an examination (Tr. 230); he spent only seven days to prepare the three job analyses. (Tr. 224) Rosenberg himself testified that a thorough job audit normally requires from a few days to two weeks (Tr. 229). Finally, although it was intended that Rosenberg actually prepare the examinations themselves, he was reassigned to another position and the task fell to Helene Willingham. Although Rosenberg may have known considerably more about the job of Sup. HRS than the written job analysis discloses, Willingham never secured the benefit of his knowledge. On the contrary, as it turned out Rosenberg took no part in the construction of the exam and did not review it before it was administered to insure that it matched the job profile (Tr. 201, 205, 210, 247).

Nor do the supplemental interviews of four employees in higher titles cure the inadequacy of the sample. Plaintiffs' expert, Felix Lopez, testified that such interviews could not substitute for the perceptions of those holding the job to be tested, and that an adequate sampling of both categories of employees was necessary to a proper job analysis. (Tr. 574–575)

The relatively casual approach which characterizes the sampling of the Sup. HRS population is evident in the written job analysis itself. A critical step in any job analysis is the largely inferential one of breaking down an observed task into a set of component skills, abilities and knowledge (Tr. 521–522; 575–576) or, as Williams put it, a "going from some observation to a verbal description which is understandable to some set of people who will be involved in the act of putting together the [test]." (Tr. 525)

Lopez testified that he would not be able to construct a content-valid test on the basis of the job analysis and test plan. (Tr. 585) His criticisms were sensible and persuasive. First, the descriptions of both "typical tasks" and "knowledge and skills" [16] are too ambiguous and unrefined to give any real idea about what the job involves and what is required to perform it. (Tr. 570, 572, 576, 580, 585–586; see also 518–519) The job analysis does not indicate what level of proficiency is required as to each skill, a critical defect. (Tr. 576–577, 580, 588) It does not explain how or why the skills in the test plan were weighted as they were, also a serious defect (Tr. 585–588); or even suggest—apart from the "examples of typical tasks"—that the jobs held by those in the title of Sup. HRS can be different from one another and require different abilities (Tr. 469–71).

Neither Rosenberg nor defendants' experts satisfactorily refuted the existence of these defects in the job analysis. Rosenberg testified that in order to determine what knowledge or skills were essential to performance in the job, he "analyzed each and every one of the functions, activities, jobs, duties, and determined that they fit into certain common areas . . . and as a result came up with the eight categories that became, in effect, the test plan." (Tr. 199–200) These were weighted, Rosenberg testified, according to "the incidence of the performance of specific types of duties and the essential importance, the criticality of the types of decisions that would impinge [sic] on knowledge or lack of knowledge in the specific areas." (Tr. 201–202)

Although Rosenberg correctly stated the general procedure to be followed, he did not detail how it was applied to the job analysis for Sup. HRS (but see Tr. 257, 407–408, 587–588).[17] However, it is evident that no matter how well he applied the procedures, they could not have resulted in a thorough analysis. A determination that "each and every one of the functions, activities, job, duties" of a Sup. HRS fits into eight common areas is necessarily flawed where, as here, much of the spectrum of tasks remains uninvestigated. Similarly, a weighting of the relative importance of "knowledge and skills" which is based on the relative frequency of their occurrence requires a sufficient sample to insure reliable measurement. Yet, as the written job analysis frankly acknowledges, Rosenberg listed only *"examples of typical* tasks"* (emphasis supplied).

C. Helene Willingham prepared the examinations for the title of Sup. HRS.[18] She has been with the Examin-

16. For example, the task "negotiation for funds to permit on-the-job development of disadvantaged residents of poverty areas of N.Y.C." (Defendants' Exhibit F) might involve letter writing, attending meetings, face-to-face negotiation, legal research and many other skills; the capsule description provides no clue as to which. (Tr. 588) The task "encourages Community Corporations to develop expertise so that they can become autonomous of C.D.A. supervision" is similarly ambiguous. The same criticism applies to the "knowledge and skills required," which include, for example, "ability to supervise and direct staff," "knowledge of community and public relations" and "skills in deciding problems relative to such on-the-job situations as office services, payroll, budget and personnel."

17. In fact Rosenberg conceded that his consultation of previous notices of examination played a significant part in his determination of relative weights (Tr. 199).

18. The determination of what sort of examination would be appropriate for the job titles in issue appears to have been casually made. Rosenberg, who was to construct the tests, considered giving an examination based partly on "training and experience". Such an exam involves rating of applicants partly according to a resume of their education and employment history, and partly on a normal written test of the multiple choice type (Tr. 205–206). However, Rosenberg appears to have left the scene before a final choice was made; the record does not indicate who made the critical decision as to the kind of test to be used (Tr. 521–522).

Moreover, the decision to peg the passing score on the examinations at 70% appears to have been based on administrative convenience rather than a determination that such

ing Division of the Department of Personnel since 1959 and has prepared over 200 examinations, most of them in the social services area (Tr. 259–60). In preparing the examination for Sup. HRS, she consulted the notice of examination, and the job analysis and test plan. However, the fact that she supplemented these with her own knowledge about the job title and ideas about what ought to go into the exam (Tr. 280) and consulted the director of the Training Staff of HRA as to functions and skills involved in the Sup. HRS title (Tr. 279–280) suggests that she did not find Rosenberg's work sufficiently complete. For example, she felt that the area of the test plan relating to "machine, equipment and supply purchase, usage and management" was weighted too heavily because "it might have been too particular and too many people wouldn't know anything about it." (Tr. 291–292)

The raw material for the individual questions or "items" on the examination came from several sources. Willingham consulted "all sorts of HRA procedural material and newsletters" distributed to component agencies of HRA, various professional journals and government publications she thought relevant, and newspaper clippings and various texts. (Tr. 264–265) She also made extensive use of the training materials used in a course given by HRA to prepare candidates for the Sup. HRS exam. (Tr. 273–274)

On reviewing the test plan and job audit, Willingham determined that some questions ought to be constructed by her staff and others ought to be referred to experts in particular fields. (Tr. 270) Accordingly, she invited two outside experts to submit questions dealing with community organization and community relations, supervision and current events, of which nine or ten were used on the examination. (Tr. 272–273) There is no indication that Willingham prescribed any requirements as to the level of proficiency or areas of concentration the questions should test. Indeed, it would have been difficult for her to do so, since neither the job analysis nor test plan provides any basis whatever for such refinements.

Indeed, a similar problem exists with regard to the approximately seventy questions prepared by Willingham and her staff.[19] Although she stated that "it was certainly possible to decide on certain critical knowledges" based on Rosenberg's materials (Tr. 291), Willingham did not explain how she did so, or decided such matters as the degree of difficulty of the questions. However, that is beside the point, since the fact

---

a score separated those who are qualified for the job from those who are not. See *Kirkland*, 374 F.Supp. at 1377. Rosenberg testified that the passing grade was set at 70% because it was the normal City practice to do so. (Tr. 248–249, see also Tr. 456–458, 612–616)

19. Of these seventy questions, Willingham based about twenty on materials used in an HRA training course (Tr. 274, 281) whose primary purpose was to prepare candidates for the examination (i. e., make them "test-wise"), rather than to make them more effective Supervising Human Resources Specialists (Tr. 281, 292–293). Although the course was free of cost and open to all provisionals (Tr. 281) there is no evidence as to how many people attended it (Tr. 294). It is noteworthy, however, that the course included "orientation in taking multiple choice questions, how to answer graph ques-

tions, reading questions," (Tr. 281) and that questions on graph interpretation and reading did in fact comprise a substantial portion of the Sup. HRS examination that Willingham constructed. These questions were the very ones which Willingham considered eliminating in view of their discriminatory bias (Tr. 298); moreover, there was substantial evidence that the examination favored "test-wise" candidates familiar with multiple choice examinations. (Tr. 297–298, 314–316, 550–553, 609–612, 621–622, see also Barrett affidavit, Paragraph 8). In short, the City's concern for total security with regard to the possible contents of the exam (Tr. 200, 237–238, 281–282) appears to have boomeranged somewhat; since HRA officials saw neither the test plan nor the examination prior to its administration, they were not in any position to prevent the possible advantage flowing to candidates who took the training course.

that the job analysis and test plan needed refinement by Willingham suggests that they were inadequate to begin with.

Defendants' experts were unenthusiastic in their appraisal of the examination. Although Williams testified that the test was "reasonably well put together," both he and Katzell expressed reservations about the quality of the item construction. Katzell observed that it was "quite evident" that many of the myriad rules governing the proper phrasing of questions and multiple-choice options on the test were violated (Tr. 411–412, 503).

Lopez concluded the test was "poorly constructed" (Tr. 600). In particular he noted that many questions appear to have more than one correct answer—even to an expert in the field; while others suggest the proper answer to a test-wise candidate who may not in fact "know" the answer. Indeed, the record suggests, if it does not establish, that the exam favored those with formal education, although only minimum educational requirements were imposed on candidates. (Tr. 590–597; 600–605; 621–622, see also Tr. 297–298, 312–316, 550–553, Barrett affidavit, Paragraph 8)

■■■ D. The evidence as to the inadequate manner and method of preparation of the job analysis and the examination creates the "rebuttable inference" that the examination is not job-related. *Vulcan*, 490 F.2d at 395–396. Although in cases of this type the primary emphasis is on the validity of the methods used in creating the examination rather than the independent validity of the end product, *Kirkland*, 374 F.Supp. at 1373, the opinion testimony as to the content-validity of the exam itself confirms our conclusion that defendants have not shown the examination to be job-related.

Harold Yourman, Director of Labor Relations at HRA, has been with the Agency since 1967. Although he observed that the exam "delves into the agency, HRA, [and] covers the full spectrum of HRA" (Tr. 362–363, 395) and is generally related to the position (Tr. 363), he expressed reservations about the substantial number of questions on supervision (Tr. 341–342, 391, 395) and conceded that the exam was not directly related to his earlier duties as a provisional Sup. HRS (Tr. 395–396).

Katzell is concededly not well-acquainted with the content of the job (Tr. 427) and her conclusion that the test "appears to have content-validity" (Tr. 479–80, 474–477) must be viewed in that light. She observed, as is obvious, that the questions on reading comprehension, vocabulary and graph interpretation related to those areas on the test plan (Tr. 427). However, these were the very areas that Willingham considered eliminating from the test, because of their possibly discriminatory bias (Tr. 298, see also Tr. 292–300) and which Lopez particularly criticized (Tr. 608–612). As to other areas of the test, such as that dealing with knowledge of the constituent agencies of HRA, Katzell testified that it would be "desirable" or "appropriate" to have such knowledge (Tr. 475–477) but did not suggest it was critical.

Like Katzell, Williams stopped short of stating that the test was content-valid, observing only that the procedures used to construct the test were consistent with content-validity (Tr. 504) and, somewhat tautologically, that successful performance on the test certifies that a candidate possesses the particular knowledge being tested for (Tr. 546–549; see also Tr. 247, 620). Indeed, none of the witnesses was willing to say that the test was useful for selecting those who were likely to perform well on the job, which as we view the matter is the only reason for administering it. (See Tr. 247–248, 390, 449, 546, 569–70, 590, 605, 612, 620–621)

E. As noted above, direct testimony regarding the manner of preparation and job-relatedness of the five examinations under challenge was for the most part limited to the two examinations (promotional and open competitive) for the position of Sup. HRS under attack

in *Jones*; the parties stipulated that the same testimony would be given as to the examinations involved in *Williams*. Although our findings as to the Sup. HRS exam require a finding that the other three exams (the open competitive exam for HRS and Senior HRS and promotional exam for Senior HRS) are not job-related, a comparison of the job analyses, test plans and examinations viewed as a group fortifies this conclusion.

For example, the job analyses and test plans for HRS and Senior HRS (Plaintiffs' Exhibits 8 and 9) identify "knowledge and skills" and "areas to be covered" that are almost identical to those listed in the analysis and plan for Sup. HRS; the relative weights assigned to the areas of the test are also substantially identical for all three titles. (Tr. 616–619) Not surprisingly, therefore, the tests based on these documents were very similar; Willingham, who prepared them, stated that the exams for HRS and Sr. HRS had forty questions in common (of a total of eighty), as did those for Sr. HRS and Sup. HRS. However, she sought to make the other forty questions on each test somewhat more difficult than those on the next lower level (Tr. 318–320).

The problem with Willingham's approach is that the job analyses and test plans provide no basis for rational differentiation between the three levels to be tested. (Tr. 618–620, 662–663) The fact that the materials prepared for the three titles do not distinguish to any appreciable extent between the nature of the jobs or the level of competence needed to perform them confirms our conclusion that the examinations were not carefully prepared and, consequently, not job-related.

F. Although what we have said so far decides the case, it is necessary to comment further on certain factors which set the present suit somewhat apart from other cases of this type and which, as defendants view the matter, support a finding of job-relatedness.

In *Chance, Vulcan, Bridgeport Guardians* and *Kirkland,* the public agencies involved either had prepared no job analysis at all, or pieced one together from pre-existing documents of doubtful value for purposes of exam preparation. Moreover, with the possible exception of *Chance,* which involved supervisory positions in the New York City school system, the cases deal with positions (policeman, fireman and correction sergeant) whose component skills and tasks are relatively easy to define. This combination of factors somewhat simplified the determination as to job-relatedness in earlier cases.

The present suit does not readily fit into the mold established in earlier decisions. It is evident that the "job" of supervising HRS is not a job in the same relatively restrictive sense as the job of policeman or fireman. Indeed, as Rosenberg acknowledged, jobs performed by individuals in the title of Supervising HRS may have nothing in common with each other except salary and general level of responsibility (Tr. 243). Not surprisingly, therefore, defendants argue that the exams in issue pass constitutional muster even though they are not demonstrably related to a defineable "job". They contend that because HRA cannot in fact predict the type of work to which an individual might be assigned, the examinations were designed to test mastery of skills which Rosenberg found to be basic to all jobs performed by Supervising HRS's (see Tr. 199, 202, 240–243, 251–252, 275, 546).

The weakness of this argument is that defendants have not established either that there is in fact such a core of skills common to all jobs within the extraordinarily diffuse titles in issue (see Tr. 393-395, 421–422, 470–471) or that Rosenberg successfully identified them. Indeed, the evidence suggests the contrary. To cite the most obvious example, the examination for Sup. HRS involved twenty to twenty-five questions (of a total of eighty) relating to supervisory skill but, as noted earlier, only 60% to 65% of those in the title actual-

ly have supervisory responsibility (Tr. 391, 478).

Moreover, the ten questions on the promotional exam for Sup. HRS relating to the internal organization of HRA were understandably attacked as peripheral to the duties of many individuals in the title (Tr. 474); it is difficult to see how such questions can be considered essential to all those in the title in view of the fact that the *open competitive* exam for Sup. HRS omitted these very questions in favor of more general questions dealing with "Functions of Relevant Public and Private Agencies" (Tr. 278–279).

Indeed, if defendants are correct that the examinations tested skills common to all jobs within the title and were job-related, it is nearly past understanding why substantial numbers of provisionals at all three levels failed the examination; and why the overall pass rates for the open competitive exams for Sup. HRS and HRS were higher than on the promotional exams for the same titles.[20] (See Tr. 450–457, 248, 327–328, 392–393, 615–616) Many of the provisionals who failed the exams in issue had been in their jobs for two years or more and, significantly, the only evidence in the record indicates that they were highly effective performers.[21] Despite the fact that the existence of large numbers of provisionals who had taken the tests provided a unique opportunity for a concurrent validation study, (Tr. 529 ff.) defendants have come forward with no

evidence to suggest that provisionals were doing an inadequate job.

IV.

REMEDY

Plaintiffs seek and are entitled to declaratory and injunctive relief. Accordingly, Examinations 2013, 1631, 1097, 1099 and 1626 are declared unconstitutional and defendants are enjoined from making appointments from eligible lists based on their results, and from terminating the provisional appointments of those in plaintiffs' proposed class to their respective positions solely because they failed the examinations.

In addition, plaintiffs seek affirmative relief (1) requiring defendants to appoint an unspecified number of members of plaintiff class to the three positions "based on their experience, education and qualifications," including evaluation of their performance as provisionals; (2) directing defendants to develop and administer either written examinations in accordance with the EEOC guidelines,[22] or some other selection process which is non-discriminatory and job-related; (3) establishing a temporary procedure for selection to the three positions while new permanent procedures are developed or, alternatively, (4) directing the permanent appointment of the present provisionals to the jobs they now hold.

Although the invalidation of the five examinations in issue authorizes the court to fashion appropriate affirm-

---

20. On the Sup. HRS exam, 31% of the candidates passed the promotional exam, while 36% passed the open competitive exam. On the HRS exam 24% passed the promotional exam; 33% passed the open competitive. 37% passed the open competitive exam for Sr. HRS; 41% passed the promotional exam.

Even more significantly, only 41 out of 174 provisional Sup. HRS's passed the test to qualify for permanent employment in the position they were already performing. See plaintiffs' memorandum in support of application for preliminary relief, page 6.

21. The named plaintiffs have filed affidavits of their supervisors as well as HRA per-

formance rating forms which uniformly indicate a high level of professional performance on the very jobs for which they were tested here. See, e. g., affidavit of Miguel Martinez, dated September 8, 1974; affidavit of Carolyn Gentile, dated September 7, 1973, both in support of plaintiffs' application for a preliminary injunction.

Defendants' witness, Harold Yourman, testified that the provisionals with whose work he was familiar were all competent performers (Tr. 392).

22. See "Equal Employment Opportunity Commission Testing and Selecting Employees Guidelines," 29 C.F.R. § 1607 at § 1607.5(a).

ative relief, see Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), *Guardians,* 482 F.2d at 1340, the proper course is to defer decision as to the nature and extent of affirmative relief to enable defendants to respond to proposals set forth in plaintiffs' post-trial brief. Accordingly, defendants are directed to file a memorandum on these issues within ten days of the filing of this Opinion, with plaintiffs to submit any reply within one week thereafter.

■ There remains the matter of plaintiffs' motion for a class action determination in both *Williams* and *Jones.* Plaintiffs' proposed class is composed of Blacks and Hispanics who took and failed one or more of the five challenged examinations; or who took and passed an examination but scored too low to be initially appointed. Defendants have no objection to the grant of class status if the class is limited to those who failed an exam. However, although plaintiffs have satisfied the requirements of Rule 23, there is no need to designate a class; plaintiffs have requested only declaratory and injunctive relief, which will in any event benefit all members of the proposed class. See *Vulcan,* 360 F.Supp. at 1266–1267, note 1; *Bridgeport Guardians,* 354 F.Supp. at 783; 3B Moore, Federal Practice ¶ 23.10–1 at 2768 (2d Ed. 1969). Accordingly, the motion is denied.

■ Plaintiffs' request for an award of reasonable attorneys' fees is denied. Although counsel fees were awarded in *Kirkland,* 374 F.Supp. at 1380–1382, they are not appropriate in the present suit. *Kirkland* involved an examination for the position of correction sergeant, whose preparation did not present the uniquely difficult problems involved in testing for the titles in issue here. Moreover, while in *Kirkland* there was an almost complete failure of proof on the issue of job-relatedness, we are impressed in the present case by the sincere efforts of Rosenberg and Willingham to construct tests in accordance with the stringent legal standards applicable in this Circuit, however inadequate the examinations proved to be.

Submit order.

### Supplemental Opinion

Plaintiffs move, pursuant to Rule 54(b), Federal Rules of Civil Procedure, for an order revising our Opinion filed January 10, 1975, by striking from it the paragraph relating to plaintiffs' request for counsel fees, (Slip Op. at 42–43), and substituting a statement that we reserve decision on that issue pending clarification of the applicable law by the Court of Appeals for this Circuit and the Supreme Court.

Putting aside the procedural objections to such a course, which are persuasively set forth in Defendants' Memorandum in Opposition, the motion is denied.

We do not agree with plaintiffs that the uncertain state of the law as to the award of counsel fees in § 1983 cases justifies the unusual relief requested here. Trial courts are regularly called upon to rule when the law is not settled; we have done so in the present case and adhere to the conclusion reached in our January Opinion.

It is true that we awarded counsel fees in Kirkland v. N. Y. State Department of Correctional Services, 374 F. Supp. 1361, 1380–1382 (S.D.N.Y.1974). In doing so, we noted that the issue of availability of attorney's fees in § 1983 cases is "novel, at least in this Circuit," and catalogued at some length decisions of other Courts of Appeal which approved the award of fees in similar cases, "without relying on a showing of bad faith or unreasonable obduracy by defendants." 374 F.Supp. at 1381.

We did not express a view as to whether a trial court *must* award counsel fees in every § 1983 case in which fees would have been awarded had the suit been brought by a parallel jurisdictional route, e. g., Title VII of the 1964 Civil Rights Act. Indeed, it was not necessary in *Kirkland* to determine that is-

sue; having found that counsel fees may be awarded in § 1983 cases even in the absence of bad faith, we awarded fees on the strength of our finding that "positive evidence of job-relatedness is conspicuous by its absence." 374 F. Supp. at 1378. In short, we held only that a showing of bad faith was not a prerequisite to recovery of fees; we did not hold that defendants *good* faith is not a factor to be considered in determining whether an award should be granted.

Shortly after *Kirkland* was filed, the Court of Appeals furnished a pair of clues as to its view on the subject. Jordan v. Fusari, 496 F.2d 646 (2d Cir. 1974), decided four weeks after *Kirkland,* was a § 1983 class action in which the trial judge awarded attorneys fees to successful plaintiffs who claimed unemployment compensation benefits, the fees to be paid out of the recovery. On appeal, the appellee argued that moneys in a state's unemployment fund are payable solely for unemployment benefits. Appellants disputed that contention and argued, for the first time on appeal, that fees were in any event recoverable on the private attorney general theory espoused in Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Noting that this alternative theory had not been presented to the district judge, the court remanded the issue, observing that appellants' new contention might "well justify a judgment imposing reasonable attorneys fees on defendant, without deduction from the awards to plaintiffs' class." 496 F.2d at 650–651.

While *Jordan* indicated the possible availability to successful plaintiffs in a § 1983 case of attorneys fees, it did not suggest under what circumstances they are properly awarded. The Court of Appeals intimated those standards in Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, 497 F.2d 1113, (2d Cir. June, 1974). Appellants argued that the court below had abused its dis-

cretion by refusing to award attorneys fees. The trial judge found it had discretion to award such fees, but denied them because the litigation was not compelled by defendants' "unreasonable, obdurate obstinacy," see Stolberg v. Trustees for the State Colleges of Connecticut, 474 F.2d 485, 490 (2d Cir. 1973). In affirming, the court did not "rule out the possibility that counsel fees might be appropriate in *some* § 1983 cases," but stated that "the failure of Congress to provide for such fees . . . [is] significant" 497 F.2d at 1115 (emphasis added). Because the court found only that the trial judge had not abused his discretion in denying fees, it did not comment on the legal standard applied by the trial judge. However, it did note that some of the factors to be considered in determining whether an award is to be made are "all of the facets of [the] case, the contribution made by counsel for plaintiffs, as well as the reasonableness of the resistance to the plaintiffs' claims by the defendants." 497 F.2d at 1115.

As we read *Jordan* and *Bridgeport Guardians,* the Court of Appeals—if it holds that awards are available at all in § 1983 cases—would not award them virtually as a matter of right, as in cases involving explicit statutory authorization. Following the suggestion of the Court of Appeals in *Bridgeport Guardians, supra,* we believe that the proper standard for awards in § 1983 cases lies somewhere in between "automatic" awards and those available only on the very stiff showing of defendants' bad faith.

This is the standard we applied—and intended to apply—in *Jones* in declining plaintiffs' request on the ground that defendants had made reasonable efforts to comply with constitutional requirements which, in the field of civil service testing, appear to be unusually difficult to satisfy.

The motion is denied.

It is so ordered.